UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
WILLY MALONE, JEROME WATSON, SAMMY NG,
ERIC BROCKINGTON, ROBERT ABREU, DESIREE
WILSON, EVA LEE, OLIVIA WILSON, SHERRE
WILSON, ANGEL HERNANDEZ, MARCO GONZALEZ,     Case No. 07 CIV 9583 (LTS)
NYTRICHA SMITH AND DANIEL PAULINO,

                                        Plaintiffs,    **MEMORANDUM OF**
**LAW IN SUPPORT OF**
                        -against-    **DEFENDANT UNION'S**
**MOTION TO DISMISS**

NEW YORK PRESSMEN'S UNION NUMBER 2 AND
NEWS CORP AKA NYP HOLDINGS D/B/A THE NEW
YORK POST,

                                    Defendants.
-------------------------------------------------------------------X

## DEFENDANT UNION'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO DISMISS THE COMPLAINT

Levy Ratner, P.C.
Attorneys for Defendant New York Pressmen's
Union Number 2
80 Eighth Avenue Floor 8
New York, NY 10011-5126
(212) 627-8100
(212) 627-8182 (fax)

On the Brief:
      Daniel Engelstein
      Carl J. Levine

{Worldox Files\876\002\04\07056144.DOC}

# TABLE OF CONTENTS

INTRODUCTION.................................................................................................2

STATEMENT OF FACTS ...................................................................................5

Relationship between the Union and the Newspapers ....................................5

How the Seniority System Operates....................................................................6

The Complaint.....................................................................................................7

ARGUMENT .......................................................................................................10

POINT I. CLAIMS RELATED TO EVENTS OCCURRING MORE THAN 300 DAYS PRIOR TO PLAINTIFFS' EEOC FILING ARE TIME-BARRED .........................................10

POINT II. THE COMPLAINT FAILS TO STATE A CLAIM FOR RELIEF BASED UPON CONDUCT THAT OCCURRED DURING THE LIMITATIONS PERIOD...........................11

POINT III. THE STATE LAW CLAIMS FAIL TO STATE A CLAIM ...................................15

CONCLUSION .....................................................................................................16

## TABLE OF AUTHORITIES

### FEDERAL CASES

*Atlantic Corp. v. Twombly,*
 127 S. Ct. 1955 (2007) ..................................................................................... 12

*Brass v. American Film Technologies, Inc.,*
 987 F.2d 142 (2d Cir. 1993) .............................................................................. 8

*Cates v. TWA,*
 561 F.2d 1064 (2d Cir. 1977) ........................................................................... 11

*Davis v New York City Department of Juvenile Justice,*
 2003 U.S. Dist. LEXIS 21035 (S.D.N.Y. 2003) ............................................... 13

*Day v. Moscow,*
 955 F.2d 807 (2d Cir. 1992) .............................................................................. 8

*DelCostello v. Teamsters,*
 462 U.S. 151 (1983) .......................................................................................... 9

*Delgado v. Triborough Bridge and Tunnel Authority,*
 485 F. Supp. 2d 453 (S.D.N.Y. 2007) ............................................................... 13

*Farkas v. New York Newspaper Printing Pressmen's Union Local No. 2,*
 312 F. Supp. 161 (S.D.N.Y. 1970) .................................................................... 14

*Farrell v. Burke,*
 449 F.3d 470 (2d Cir. 2006) .............................................................................. 11

*Girolamo v Teamsters Local 72,*
 1998 U.S. Dist. LEXIS 19819 (S.D.N.Y. 1998) ............................................... 15

*Graham v. Long Island R.R.,*
 230 F.3d 34 (2d. Cir 2000) ................................................................................ 13

*Iqbal v. Hasty,*
 490 F.3d 143 (2d Cir. 2007) .............................................................................. 12

*Ledbetter v Goodyear Tire & Rubber Co.,*
 127 S. Ct. 2162 (2007) ................................................................................ 10, 11

*Marshall v. Grant,*
 2007 U.S. Dist. LEXIS 82335 (E.D.N.Y 2007) ................................................ 12

*Marvel Characters v. Simon,*
    310 F.3d 280 (2d Cir. 2002) ............................................................................. 2

*Montana v. First Federal Sav. & Loan Associate,*
    869 F.2d 100 (2d Cir. 1989) ............................................................................. 12

*Nemaizer v. Baker,*
    793 F.2d 58 (2d Cir. 1986) ............................................................................... 2

*Old Republic Insurance Co. v. Hansa World Cargo Serv., Inc.,*
    170 F.R.D. 361 (S.D.N.Y. 1997) ..................................................................... 8

*Ryan et al v. New York Newspaper Printing Pressmen's Union Local No. 2,*
    590 F.2d 451 (2d Cir. 1979) ............................................................................. 14

*Teamsters v. United States,*
    431 U.S. 324 (1977) .................................................................................... 13, 14

*Transhorn, Ltd. v. United Techs. Corp. (In re Elevator Antitrust Litigation),*
    502 F.3d 47 (2d Cir. 2007) ............................................................................... 12

*United Airlines v. Evans,*
    431 U.S. 558 (1977) ........................................................................................ 11

*White v. White Rose,*
    237 F.3d 174 (2d Cir. 2001) ............................................................................. 14

*Yusuf v. Vassar College,*
    35 F.3d 709 (2d Cir. 1994) ............................................................................... 12

## STATE CASES

*Martin v. Curran,*
    303 N.Y. 276 (1983) ....................................................................................... 15

*Prin v. DeLuca,*
    218 N.Y.S.2d 761 (Sup. Ct. N.Y. Co. 1961) .................................................. 15

## FEDERAL STATUTES

42 U.S.C. § 2000e-2(h) .......................................................................................... 4, 13

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------------X

WILLY MALONE, JEROME WATSON, SAMMY NG,
ERIC BROCKINGTON, ROBERT ABREU, DESIREE
WILSON, EVA LEE, OLIVIA WILSON, SHERRE
WILSON, ANGEL HERNANDEZ, MARCO GONZALEZ,      Case No. 07 CIV 9583 (LTS)
NYTRICHA SMITH AND DANIEL PAULINO,

                                        Plaintiffs,      **MEMORANDUM OF**
                                                         **LAW IN SUPPORT OF**
                                                         **DEFENDANT UNION'S**
                          -against-                      **MOTION TO DISMISS**

NEW YORK PRESSMEN'S UNION NUMBER 2 AND
NEWS CORP AKA NYP HOLDINGS D/B/A THE NEW
YORK POST,

                                        Defendants.

-----------------------------------------------------------------------X

## DEFENDANT UNION'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO DISMISS THE COMPLAINT

Defendant New York Newspaper Pressmen's Union Number 2 ("the Union") respectfully

submits this memorandum of law in support of its motion to dismiss the Complaint, filed by

Plaintiffs Willy Malone, Jerome Watson, Sammy Ng, Eric Brockington, Robert Abreu, Desiree

Wilson, Eva Lee, Olivia Wilson, Sherre Wilson, Angel Hernandez, Marco Gonzalez, Nytricha

Smith and Daniel Paulino (collectively the "Plaintiffs"). The Union is the collective bargaining

representative of Journeymen and Junior (also known as Apprentice) Pressroom employees at the

three major New York City newspapers, the New York Times, the New York Daily News and

Defendant NYP Holdings, Inc. d/b/a the New York Post (the "Post").[1]  Plaintiffs, except for Eva

---

[1]     Pressroom employees are categorized according to seniority. Junior Pressmen (also
known as "Juniors" or "Apprentices") are, as the name implies, more junior. Journeymen are
more senior. In addition, "Casual" employees are non-Union personnel who work on an occa-
sional basis, when additional staff are needed. Casual employees are selected to work a given
Footnote continues on next page

Lee, are or were Junior Pressmen at the Post, working under a collective bargaining agreement

between the Union and the Post.

## INTRODUCTION

The Complaint in this action, riddled with vague and conclusory claims, alleges -- in gen-

eral terms -- that Defendants over a 10-year period have conspired to engage in a pattern and

practice of discrimination favoring white males. Complaint at ¶ 1.[2] The supporting allegations

largely omit any reference to dates, specific events, or any details concerning whether, when, or

how any of the Plaintiffs were involved in or affected by Defendants' alleged conduct. Further-

more, a careful review of these allegations reveals that the claims either involve events that are

---

shift through a process known as "shaping," in which Casual employees arrive at the work site
and are selected for work according to their priority on a list known as the "casual list." After
working a certain number of shifts, Casual employees become eligible to join the Union and be-
come Junior Pressmen. Complaint at ¶¶ 19, 20.

[2]    This action is the most recent in a series of lawsuits arising out of the same alleged gen-
eral conduct – alleged discrimination in hiring, the continuing effect of that alleged discrimina-
tion and/or the alleged manipulation of seniority lists. For example, four plaintiffs in the present
action - Desiree Wilson, Sherre Wilson, Olivia Wilson and Jerome Watson - previously filed a
discrimination claim against Defendant Union in this Court (Case No. 05 Civ. 10355
(LTS)(DFE)) that they withdrew with prejudice by order dated March 13, 2006. Accordingly,
they are legally precluded from re-litigating any claims that they raised, or could have raised, in
that litigation. See, e.g., Marvel Characters v. Simon, 310 F.3d 280, 287 (2d Cir. 2002); Ne-
maizer v. Baker, 793 F.2d 58, 60-61 (2d Cir. 1986).

Similarly, Plaintiff Paulino previously has filed at least two actions in this Court, the most
recent of which (06 Civ 00053 (GBD)) alleged discrimination with respect to the union seniority
lists and the manipulation of these lists. That action was dismissed by this Court in a Memoran-
dum and Order dated May 7, 2007 (referred to here as the "Decision") that currently is on ap-
peal. That Decision, attached hereto as Exhibit A for the Court's convenience, describes the in-
dustry-wide seniority system at issue here, the manner in which seniority is based upon applica-
tion of a mechanical formula, and the failure of plaintiffs, in that case, to raise any issue of mate-
rial fact as to the purported manipulation of the seniority list.

outside of the applicable limitations period, fail to allege that Plaintiffs were treated differently than similarly situated white men, or both.

Notwithstanding Plaintiffs' vague allegations, the Complaint appears to focus on two primary claims: (1) that the continuing effects of alleged past hiring discrimination have adversely impacted Plaintiffs' current seniority rank; and (2) that the 2006 transfer of eleven Journeymen to the Post has adversely affected Plaintiffs.

The first of these claims is that unspecified Plaintiffs were discriminated against when they shaped for employment as Casual employees, which thereby delayed the date on which they were promoted to Junior Pressmen and lowered their seniority when they eventually did become Junior Pressmen. *See, e.g.,* Complaint at ¶¶ 51, 55, 56, 113,114.[3] However, Plaintiffs do not dispute the fact that they ultimately became Junior Pressmen. *See, e.g.,* Complaint at ¶¶ 9, 10, 86, 87, 88. Without stating when the underlying discrimination in their selection as Casual employees took place, Plaintiffs allege that their lower seniority rankings, resulting from this previous alleged discrimination, continues to adversely affect them because work allocation and advancement to Journeymen status is based upon a mechanical seniority system. *See, e.g.,* Complaint at ¶ 57.

The second claim involves Plaintiffs' speculation that the Union negotiated a so-called "commercial agreement," allowing for the transfer of outside Journeymen to the Post, as a pre-

---

[3]    Plaintiffs have erroneously numbered their Complaint. Specifically, following ¶ 114 the Complaint begins numbering the paragraphs again at ¶ 100. Thus, there are two separate and distinct paragraphs for each paragraph numbered 100-114. In order to address this error and allow clear citation the Union will designate the second set of paragraphs numbered 100-114 as ¶ 100(2), ¶ 101(2), etc.

text for discrimination against non-Journeyman women and minorities. *See, e.g.*, Complaint at ¶¶ 61-62, 98.

As set forth below, the claims based upon these two allegations should be dismissed for the following reasons:

(1)    The Hiring and Seniority Claims are Untimely

The hiring discrimination that Plaintiffs allegedly experienced when shaping for work as casuals took place well outside any limitations period applicable here. Furthermore, the alleged ongoing effects of such past discrimination do not constitute an independent claim within the applicable limitations period under established Supreme Court precedent.

(2)    The Transfer-Related Claims Fail to Provide a Plausible Basis Upon Which to Infer Intentional Discrimination

The Complaint does not allege that the 2006 transfers affected Plaintiffs any differently than similarly situated white male Junior Pressmen at the Post. Indeed, the Complaint concedes that all the Post Junior Pressmen, including white males who constitute a majority of this group, were equally affected by the transfers.

(3)    The Transfers Reflected the Operation of a Bona Fide Seniority System Protected by Title VII

Furthermore, the Complaint concedes that Journeymen have greater seniority, and therefore receive priority over Junior Pressmen with respect to work assignments. Accordingly, the transfers are an extension of a bona fide seniority system specifically protected under Title VII. See 42 U.S.C. §2000e-2(h).

(4)    The State Law Claim Fails to Allege that Each Member of the Union Authorized or Ratified the Unlawful Conduct

Under New York law, unincorporated associations such as the Union cannot be liable for claims under Executive Law § 296 unless it is shown that every member of the association authorized or ratified the conduct at issue.  Plaintiffs have failed to allege-- and could not reasonably allege –that every member of the Union authorized or ratified the purportedly unlawful conduct in this case.

## STATEMENT OF FACTS

### Relationship between the Union and the Newspapers

For decades, Defendant Union has represented pressroom employees at the New York Post, the New York Times, and the New York Daily News (collectively the "Newspapers").  The pressroom employees represented by the Union are covered by collective bargaining agreements ("contracts") between the Union and the Newspapers. Complaint at ¶¶ 17, 18.

Each of the contracts provide for specific staffing for pressroom work (*i.e.*, work involved in running and maintaining the presses).  For instance, the contracts specify how many Journeymen and Junior Pressmen must be hired depending upon the number of presses in use and the size of the newspaper being printed.

If on any given shift there are not enough Journeymen available to work the required Journeymen shifts and/or Junior Pressmen to work the required Junior Pressmen shifts, the Newspapers are required to fill those vacancies with other Union members working in the relevant shop, or with other Journeymen and Junior Pressmen drawn from other newspapers.

If the vacancy cannot be filled in this manner, the newspaper must go outside the collective bargaining unit to hire Casuals.  Complaint at ¶¶ 29, 30, 33, 53.

## How the Seniority System Operates

The process by which someone enters the regular workforce as a Junior Pressman, and then advances from Junior Pressman to Journeyman status, is based upon a decades-old mechanical seniority system. Decision at 3-4. At the entry level, Casual employees -- who otherwise are not covered by a contract and are not members of the Union (Complaint at ¶ 28) -- become regular Junior Pressmen after working a certain minimum number of shifts during any six month period beginning on the first day of January or July in any year. Complaint at ¶¶ 30, 34. *See also* Decision at n.4.

When a Casual becomes a Junior Pressman, he or she is added to the newspaper shop priority list and the industry-wide seniority list. On the industry list, two seniority dates are calculated. The first date is the so-called JAC (Joint Apprenticeship Committee) date, which sets a Junior Pressman's priority for purposes of filling open Junior Pressman positions outside their regular workplace. The second date determines a Junior Pressman's place on the so-called "Revisions List" from which Junior Pressmen are advanced to Journeymen. Both dates are calculated using long-standing mechanical formulae based upon number of shifts worked. Complaint at ¶¶ 47, 48; Decision at 3-4 and n.4.

Junior Pressmen are advanced to Journeyman status strictly on the basis of seniority, and only when a Journeyman position comes open. Complaint at ¶ 44. Therefore, there must be sufficient available Journeyman shifts to accommodate another regular Journeyman position at a given newspaper before the most senior Junior Pressman at that newspaper will be advanced to Journeyman status.

Due to the strict seniority nature of the system, if the most senior Junior is not advanced, because there are not enough available Journeyman shifts at his or her paper, less senior Juniors

{Worldox Files\876\002\04\07056144.DOC}

6

cannot be moved up to Journeyman status even if at *their* newspaper there are sufficient Journeymen shifts available. They have to wait until a Journeyman position opens up at the newspaper where the most senior Junior is employed whether as a result of increased work opportunities, or the discharge, death, retirement or transfer of Journeymen at that newspaper.

### The Complaint

The Plaintiffs, except for Lee,[4] became Junior Pressmen and members of the Union more than four years ago.[5] Plaintiffs allege that the Post discriminated against them during the period before they became Junior Pressmen when they were hired as Casuals at the shape. *See, e.g.,* Complaint at ¶¶ 35, 36, 51, 55, 56, 57 and 104(2).[6] As a result, Plaintiffs contend that they became Junior Pressmen later than white males who shaped at the same time, and therefore have a lower seniority rank for purposes of becoming Journeymen. Complaint at ¶ 83.

---

[4]    Notwithstanding any claims to the contrary contained in the present Complaint, Plaintiff Lee is not and never has been part of the bargaining unit represented by the Union. Lee conceded this point in a separate lawsuit filed against the Post in this Court earlier this year. This pending action for discrimination at the Post is based upon an EEOC claim, does not name the Union as a defendant, and refers primarily to discrimination in the shape for the mailroom, which is staffed by employees represented by another craft union. *See,* Case No. 07 Civ 6475 (JR).

[5]    The fact that Plaintiffs Desiree Wilson, Olivia Wilson and Jerome Watson achieved Junior Pressman status more than five years ago is evidenced by the allegations contained in their earlier lawsuit. *See* Case No. 05 Civ. 10355 (LTS)(DFE), Complaint at ¶¶ 23, 24, 50, 51, 55. This Complaint also acknowledges that Watson has since been discharged and is no longer a member of the Union, or covered by a collective bargaining agreement to which the Union is a party. Id. at ¶ 67. While the Union does not believe that it is necessary for the disposition of the present motion, it is prepared to show that all of the other Plaintiffs, with the exception of Lee, became employees of the Post and members of the Union at least four years ago, and that Plaintiff Malone, like Watson, was discharged and -- as a result -- is no longer a member of the Union.

[6]    Paragraphs numbered 86 through 88 allege that Plaintiffs became Junior Pressmen, but do not specify when that happened or the preceding period during which plaintiffs sought work as Casuals and were allegedly subject to unlawful discrimination.

Plaintiffs' allegation that the relevant seniority lists were manipulated appears to be little more than another iteration of their claim that alleged discrimination surrounding the Casual shape continues to impact their seniority *See, e.g.*, Complaint at ¶s 51, 52, 53, 55, and 57. Notably, the alleged "manipulations" have not been described, and there are no allegations that: (1) any "manipulation" took place during the applicable limitations period; (2) involved Plaintiffs; or (3) would have resulted in any change in Plaintiffs' seniority rank. *See, e.g.*, Complaint at ¶ 105(2). Moreover, this Court specifically rejected, in Case No. 06-00053 (JR), Plaintiffs' counsel's "manipulation" allegations with respect to Plaintiff Paulino; and the Wilson and Watson Plaintiffs waived with prejudice any "manipulation" claims against the Union in Case No. 05 Civ. 10355.

Plaintiffs do not allege that any of them shaped as Casuals in the pressroom during the 300-day period before the EEOC charge related to this action was filed, and the EEOC filing date itself is not apparent on the face of the Complaint. Complaint at ¶ 6. In fact, the earliest charge related to this action was filed on August 28, 2006 by Plaintiff Willie Malone. Attached as Exhibit "B" is a copy of the cover sheet related to that charge.[7]

The Complaint's only allegation explicitly identified as having occurred within the applicable limitations period is the transfer of Journeymen to the Post in 2006. Complaint at ¶¶ 91-

---

[7]    It is permissible and appropriate for the Court to take judicial notice of the Court and EEOC documents referred to in the Complaint, and the Defendant Union respectfully contends that such notice is appropriate here. See Brass v. American Film Technologies, Inc., 987 F.2d 142 (2d Cir. 1993); Old Republic Ins. Co. v. Hansa World Cargo Serv., Inc. 170 F.R.D. 361 (S.D.N.Y. 1997) (on a Rule 12(b)(6) motion, courts may take judicial notice of facts in the public record that are submitted to them by litigants); Day v. Moscow, 955 F.2d 807 (2d Cir. 1992) (courts take judicial notice of prior court records and decisions).

96. However, even here, Plaintiffs allege that these transfers "had a disparate impact on minorities and women due to their ranking on seniority lists, <u>based upon the discriminatory practices of Defendants at the shape</u> [i.e. casual hiring] where Caucasian shapers were and are given preferential treatment over minorities and women." Complaint at ¶ 96 (emphasis added).

Aside from the alleged disparate impact that resulted from supposed past discrimination -- outside the limitations period -- the Complaint does not allege that the 2006 Journeymen transfers affected women and minority Junior Pressmen any differently than similarly situated white male Junior Pressmen. To the contrary, Plaintiffs repeatedly aver that the transfers affected all non-Journeymen. Complaint at ¶¶ 75, 78, 93.[8]

Finally, the Complaint appears to allege that the Union breached its duty of fair representation, though no separate cause of action is listed for any such alleged breach.[9] Plaintiffs raise these allegations: (1) without providing any information concerning the nature of grievances that the Defendant Union supposedly ignored; (2) without specifically alleging that the Union was

---

[8]    *See, e.g.*, Complaint at ¶ 75 ("All transfers were placed at the bottom of the upper class of Journeymen, thus displacing employees below them"); Complaint at ¶ 93 (The transferees displaced women and minorities <u>by cutting ahead of every other non-Journeymen</u> [Post] employee"); Complaint at ¶ 112. ("the Transfers are designed to guarantee opportunities for Caucasian Journeymen at the expense of Post employed minorities, women and <u>other [white male] apprentices</u> and casuals"). Emphasis and brackets added.

[9]    The courts have inferred that unions have a duty of fair representation to those they are charged with representing pursuant to the Labor Management Relations Act. The statute of limitations for filing such claims is six months. *See* <u>DelCostello v. Teamsters</u>, 462 U.S. 151, 169-72 (1983).

asked to pursue any such grievances and refused to do so; and (3) without alleging that any such refusal was arbitrary or capricious. *See, e.g.*, Complaint at ¶¶ 111,112.[10]

## ARGUMENT

### POINT I.
### CLAIMS RELATED TO EVENTS OCCURRING MORE THAN 300 DAYS PRIOR TO PLAINTIFFS' EEOC FILING ARE TIME-BARRED

With the sole exception of claims involving the alleged discriminatory effect of the 2006 Journeymen transfers, all of Plaintiffs' claims are time barred, inasmuch as they are based on events that occurred outside of Title VII's 300-day limitations period. Specifically, all of Plaintiffs' claims – other than the 2006 transfers – arise out of alleged discrimination against female and minority Casuals at the shape, yet it has been many years since any Plaintiff other than Eva Lee has attended a shape.

Plaintiffs appear to claim that their untimely allegations of discriminatory conduct are actionable because alleged conduct at long-ago shapes had effects that have lingered into the statutory period. Complaint ¶¶ 55, 57, 104, 121. However, the Supreme Court recently rejected this theory in Ledbetter v Goodyear Tire & Rubber Co., 127 S. Ct. 2162 (2007). As the Supreme Court noted:

---

[10]     Without providing any salient details, the Complaint alleges that the two of the Plaintiffs were unfairly discharged. Complaint at ¶ 116. The two Plaintiffs who were discharged were Malone and Watson. Watson was discharged in 2004, beyond the limitations period, and before he withdrew with prejudice any claims he had against the Union. *See* Case No. 05 Civ. 10355 (LTS)(DFE), Complaint at ¶ 67. The Union avers that Malone was discharged this past summer. In the Complaint neither Watson nor Malone allege that: (1) they asked the Union to challenge their discharge; (2) there was any basis for such a challenge; or (3) that the pending EEOC charges were amended to include any allegation of unlawful termination.

> The EEOC charging period is triggered when a discrete unlawful practice takes place. A new violation does not occur, and a new limitations period does not commence, upon the occurrence of subsequent nondiscriminatory acts that entail adverse effects resulting from past discrimination.

Id. at 2169 (citing AMTRAK v. Morgan, 536 U.S. 101, 113 (2002)). See also, United Airlines v. Evans, 431 U.S. 558, 561 (1977) (holding that discriminatory acts not made the basis for a timely charge have no present legal consequences), Cates v. TWA, 561 F.2d 1064, 1071-1072 (2d Cir. 1977) (interpreting Evans in the context of the continuing effect of prior hiring discrimination on seniority).

In the instant case, there is no question that any discrimination that Plaintiffs experienced as Casuals falls well outside of the limitations period. It is equally clear, under Ledbetter and the cases cited therein, that the continuing effects of past hiring discrimination on Plaintiffs' seniority rank do not state a new violation for purposes of the limitations period.[11]

## POINT II.
## THE COMPLAINT FAILS TO STATE A CLAIM FOR RELIEF BASED UPON CONDUCT THAT OCCURRED DURING THE LIMITATIONS PERIOD

The only challenged conduct that the Complaint alleges specifically occurred within the limitations period is the transfer of 10 white male Journeymen and one Hispanic Journeyman

---

[11]    In addition, Plaintiffs – other than Lee – who currently are Junior Pressmen do not have standing to challenge what they contend is ongoing discrimination with respect to Casuals. Plaintiffs must assert their own rights, not the rights of others. See, e.g., Farrell v. Burke, 449 F.3d 470, 494 (2d Cir. 2006).

Further, as discussed above, to the extent that five Plaintiffs - Desiree Wilson, Sherre Wilson, Olivia Wilson, Jerome Watson, and Daniel Paulino - have raised these same claims in previous lawsuits, and these claims either were dismissed or withdrawn with prejudice, they are precluded from relitigating these claims in the present action. See Footnote 2 and Page 7, supra.

pursuant to a commercial agreement negotiated by the Union in May 2006. This allegation is

facially deficient, not least because the Journeymen had seniority over every Plaintiff.

To survive a motion to dismiss, a plaintiff must allege facts sufficient to state a claim for

relief that is plausible on its face.

> While a complaint attacked by a Rule 12(b)(6) motion to dismiss
> does not need detailed factual allegations, a plaintiff's obligation to
> provide the grounds of his entitlement to relief requires more than
> labels and conclusions, and a formulaic recitation of the elements
> of a cause of action will not do. Factual allegations must be enough
> to raise a right to relief above the speculative level, on the assump-
> tion that all the allegations in the complaint are true (even if doubt-
> ful in fact).

Marshall v. Grant, 2007 U.S. Dist. LEXIS 82335 (E.D.N.Y 2007) (citing Atl. Corp. v. Twombly,

127 S. Ct. 1955, 1964-65 (2007) (citations and internal quotation marks omitted).

This Circuit has interpreted the Supreme Court's recent review of the 12(b)(6) standard in

Twombly as imposing "a flexible 'plausibility standard,' which obliges a pleader to amplify a

claim with some factual allegations in those contexts where such amplification is needed to ren-

der the claim *plausible*." Iqbal v. Hasty, 490 F.3d 143, 157-58 (2d Cir. 2007). In other words, a

complaint must contain "enough facts to 'nudge [plaintiffs'] claims across the line from conceiv-

able to plausible." Transhorn, Ltd. v. United Techs. Corp. (In re Elevator Antitrust Litig), 502

F.3d 47, 50 (2d Cir. 2007) (quoting Twombly).

To survive a motion to dismiss on a complaint alleging discrimination plaintiffs must al-

lege facts and circumstances from which intentional discrimination can be reasonably inferred.

*See, e.g.*, Yusuf v. Vassar College, 35 F.3d 709, 713 (2d Cir. 1994); Montana v. First Federal

Sav. & Loan Assoc., 869 F.2d 100, 104 (2d Cir. 1989). Where, as here, the claim is that white

males were treated more favorably than others, the Complaint must contain allegations that the

{Worldox Files\876\002\04\07056144.DOC}

12

favored white employees were similarly situated. <u>Davis v New York City Department of Juve-nile Justice</u>, 2003 U.S. Dist. LEXIS 21035 (S.D.N.Y. 2003).  In addition

> [T]o demonstrate that employees not in her protected group were favored, [the plaintiff] must plead facts showing she was similarly situated in all material respects to the individuals with whom she seeks to compare herself.

<u>Delgado v. Triborough Bridge and Tunnel Authority</u>, 485 F. Supp. 2d 453, 463 (S.D.N.Y. 2007) citing <u>Graham v. Long Island R.R.</u>, 230 F.3d 34, 39 (2d. Cir 2000).

The Complaint here does not allege that the transfers, the only event to occur within the limitations period, affected similarly situated white males any differently than women or minori-ties.  If anything, the Complaint repeatedly states just the opposite: that the other Junior Press-men, including those white males who are similarly situated to Plaintiffs, also were affected by the Journeyman transfers.

The Complaint also concedes that the transferred Journeymen had more seniority than the Junior Pressmen, and that Journeymen have priority over Juniors in the assignment of work. Complaint at ¶¶ 19-20.  This underscores that the transfer of Journeymen in need of work was consistent with Journeymen's seniority under the industry-wide bona fide seniority system.  Sec-tion 703(h) of Title VII specifically protects reliance upon such a neutral seniority system:

> Notwithstanding any other provision of this subchapter, it shall not be an unlawful employment practice for an employer to apply dif-ferent standards of compensation, or different terms, conditions, or privileges of employment pursuant to a bona fide seniority …system …

42 U.S.C. § 2000e-2(h).  *See also* <u>Teamsters v. United States</u>, 431 U.S. 324 (1977).

Since there is no allegation in the Complaint that any Plaintiff had greater seniority (or as it is called in this industry "priority") than any of the "non-minority Journeymen" pressmen who

{Worldox Files\876\002\04\07056144.DOC}

13

allegedly benefited from the transfers made since January 2006 (Complaint at ¶ 60) or the "fif-teen Journeymen from the Daily News" who transferred in pursuant to the May 2006 "commer-cial agreement" between the Post and the Union (id. at ¶¶ 61-62), Section 703(h) precludes their Title VII claim as a matter of law.

Nor do Plaintiffs state a legal claim by their allegation that the "Defendants effectuated transfer upon transfer of Caucasian News Journeymen," rather than promoting from within mi-norities and women who had not yet attained Journeyman status in the Union (Complaint at ¶101), since Journeymen by definition have greater priority than any Junior or Apprentice or (like Plaintiff Lee) a non-Union Casual. With respect to the transfer of Journeymen in particular, the Second Circuit previously has upheld this Union's considerable discretion in resolving the competing seniority rights of the employees that it represents. *See* Ryan et al v. New York Newspaper Printing Pressmen's Union Local No. 2, 590 F.2d 451 (2d Cir. 1979) and Farkas v. New York Newspaper Printing Pressmen's Union Local No. 2, 312 F. Supp 161 (S.D.N.Y. 1970).[12]

---

[12]    The sufficiency of the discrimination allegations are not enhanced by the vague and con-clusory allegations that the Union breached its duty of fair representation, particularly in light of the Union's recognized discretion in resolving conflicts involving seniority rights. The Courts have long recognized the "wide range of reasonableness" afforded unions in negotiating the of-ten competing interests of their membership. As the Second Circuit recently summarized this deference:

[A] union's actions are arbitrary only if, in light of the factual and legal landscape at the time of the union's actions, the union's behavior is so far outside a 'wide range of reasonableness,' as to be irrational. This 'wide range of reasonableness' gives the union room to make discretion-ary decisions and choices, even if those judgments are ultimately wrong. A settlement is not ir-rational [and thus arbitrary] simply because it turns out *in retrospect* to have been a bad settle-ment. A showing of bad faith requires a showing of fraudulent, deceitful, or dishonest action.

Footnote continues on next page

{Worldox Files\876\002\04\07056144.DOC}

## POINT III.
## THE STATE LAW CLAIMS FAIL TO STATE A CLAIM

Defendant Union is an unincorporated association. Under New York State Law, to survive a motion to dismiss, an action under Executive Law § 296 against an unincorporated association must plead that each of the association's members authorized or participated in the allegedly discriminatory conduct. *See, e.g,*, Girolamo v Teamsters Local 72, 1998 U.S. Dist Lexis 19819 (S.D.N.Y. 1998) (applying the rule enunciated in Martin v. Curran, 303 N.Y. 276, 279 (1983) to a claim under Executive Law § 296). *See also* Prin v. DeLuca, 218 N.Y.S.2d 761, 762 (Sup. Ct. N.Y. Co. 1961) (applying the Martin doctrine to bar state law claims against union involving alleged discrimination in the allocation of layoffs based upon sex and in violation of seniority rights).[13]

---

White v. White Rose, 237 F.3d 174 (2d Cir. 2001) (internal citations omitted).

[13]    One of the policy reasons animating the Martin rule is the fact that the costs of defending a lawsuit, whether or not meritorious, are taken from membership dues. Where, as here, there has been extensive repeated litigation over the same issues, the public policy interest in protecting the membership from a depletion of the resources needed to represent them is all the more pronounced.

## CONCLUSION

For the foregoing reasons, Defendant Union respectfully requests that the Court grant this motion, dismiss the Complaint with prejudice, and grant such other and further relief as is appropriate.

Dated: December 21, 2007
New York, New York

LEVY RATNER, P.C.

By:  Daniel Engelstein (DE2499)
Attorneys for Defendant New York
Pressmen's Union Number 2
80 Eighth Avenue
New York, New York 10011
(212) 627-8100
(212) 627-8182 (fax)

{Worldox Files\876\002\04\07056144.DOC}

EXHIBIT A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------------------x

DANIEL PAULINO,                                        :

                             Plaintiff,             :

           -against-                                 :

THE NEW YORK PRINTING PRESSMEN'S     :
UNION, LOCAL TWO, and THE BOARD OF   :
TRUSTEES and ROBERT COSTELLO,        :
Administrator, of the PRESSMEN'S     :
PUBLISHER'S BENEFIT FUND,            :

                       Defendants.            :

--------------------------------------------------------------x

                                      **MEMORANDUM DECISION**
                                       **AND ORDER**

                                       06 Civ. 53 (GBD)

GEORGE B. DANIELS, District Judge:

     In the second of two separately filed lawsuits,[1] plaintiff Daniel Paulino brings suit against

defendant The New York Printing Pressmen's Union, Local Two (the "Union"), alleging race

and national origin-based discrimination and retaliation, in violation of Title VII of the Civil

Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq., and 42 U.S.C. § 1981. Plaintiff also

alleges that his Union membership was suspended without a full and fair hearing, in violation of

the Labor Management Reporting and Disclosure Act ("LMRDA"), 29 U.S.C. § 411 et seq. The

Union moved to dismiss, pursuant to Fed. R. Civ. P. 12(b)(6), and/or for summary judgment,

pursuant to Fed. R. Civ. P. 56.

-------------------------

     [1]The first filed lawsuit was filed with this Court on May 12, 2005, against the Union and
the New York Post. Paulino v. New York Printing Pressmen's Union, Local Two, No. 05 Civ.
4647 (GBD) (Paulino I). Rather than attempting to amend the complaint for a second time,
plaintiff filed this second action on January 4, 2006, against the Union and defendants Board of
Trustees and Robert Costello. This Court subsequently dismissed the amended complaint in the
prior action on January 31, 2006. The Board of Trustees and Robert Costello's unopposed
motion to dismiss the claims against them was granted on April 5, 2006.

## BACKGROUND

Plaintiff, a Hispanic male, was hired by the New York Post as a Junior Pressman in July 2000. Compl. ¶¶ 18-19. He became a member of the Union—which is the collective bargaining agent for certain New York Post employees—in September 2000. Id. at ¶¶ 13, 24. Once a member of the Union, plaintiff, like all other Union members, became eligible for placement on the "Revisions List." Id. at ¶ 25. Placement on the Revisions List determines the order of layoffs, preferences to work additional shifts at other newspapers, and selection for vacation and other personal days off. Id. at ¶ 27. The list is also used to determine an employee's eligibility for advancement to Journeyman status.[2] Id. at ¶ 26. An employee's position on the Revisions List is determined using a formula that has existed for at least fifty (50) years, and is based on the number of shifts that the employee works as a pressman during certain periods of time. Heffernan Decl. ¶¶ 9-12; Compl. ¶ 29. Plaintiff alleges that he was wrongly, and intentionally, placed on the Revisions List by the Union below two Caucasian employees with less seniority, and that his complaints to this effect were ignored by Union leadership. Compl. ¶¶ 31-37. He also claims that his union membership was suspended after his complaints. Id. at ¶¶ 38-39.

In March 2004, employee contributions to the Publisher's-Pressmen's Welfare Fund ("Welfare Fund")—which provides hospital, medical, pharmacy, and related benefits to employees of participating employers in the newspaper industry in New York City—were

---

[2]There are two classifications of employees that work in a newspaper's pressroom. Declaration of John Heffernan ("Heffernan Decl.") (attached to the Declaration of Barry I. Levy ("Levy Decl."), Ex. 2) at ¶ 4. "Journeymen" are more experienced employees, while "Juniors" are the employees with less experience. Id. Except for rates of pay, Journeymen and Juniors receive the same contractually guaranteed benefits, including vacation, pension, and welfare benefits. Id. at ¶ 15.

2

increased due to rising healthcare costs. Declaration of Robert A. Costello ("Costello Decl.")
(Levy Decl. Ex. 1) at ¶¶ 2, 5. To help alleviate the economic impact of the rate increases, the
Welfare Fund adopted a "cafeteria plan," pursuant to Internal Revenue Code § 125, so that
contributions could be automatically deducted from participants' paychecks on a pre-tax basis.
Id. at ¶ 6; Compl. ¶ 52. All participants, including plaintiff, were informed that contributions to
the Welfare Fund could be made directly by the individual on an after-tax basis, or withheld on a
pre-tax basis by participating in the cafeteria plan, and that the failure to make contributions
using either method would result in the termination of the benefits. Costello Decl. ¶ 8, Ex. D.
Plaintiff refused to enroll in the cafeteria withholding plan, and he did not make the contributions
himself. Costello Decl. ¶ 9; Compl. ¶ 54. As a result, plaintiff's health insurance was
interrupted. Costello Decl. ¶ 9, Ex. F. Plaintiff alleges that "[t]he cancellation of [his] Health
Insurance was done to retaliate against him for his refusal to enroll in the § 125 Pre-Tax Plan."
Compl. ¶ 67. He also alleges that "the Union suspended [his] Union membership based upon his
election not to enroll in the cafeteria plan." Id. at ¶ 55; Paulino Aff. ¶ 20.


### MOTION TO DISMISS AND FOR SUMMARY JUDGMENT

In deciding a motion to dismiss, the Court must "accept as true the complaint's factual
allegations and draw all inferences in the plaintiff's favor." Cleveland v. Caplaw Enter., 448
F.3d 518, 521 (2d Cir. 2006) (citation and alterations omitted). Dismissal is only appropriate if
"it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which
would entitle him to relief." Field Day, LLC v. County of Suffolk, 463 F.3d 167, 192 (2d Cir.
2006) (citation omitted). Conclusory statements, however, "are not a substitute for minimally

3

sufficient factual allegations." E & L Consulting, Ltd. v. Doman Industries Ltd., 472 F.3d 23, 28 (2d Cir. 2006) (citation omitted).

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); June v. Town of Westfield, New York, 370 F.3d 255, 257 (2d Cir. 2004). There is no genuine issue of material fact "unless the evidence is such that a reasonable jury could return a verdict for the nonmoving party." New York Stock Exchange, Inc. v. New York, New York Hotel LLC, 293 F.3d 550, 554 (2d Cir. 2002) (citation omitted). In deciding a motion for summary judgment, the Court must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in its favor. Schneider v. Feinberg, 345 F.3d 135, 144 (2d Cir. 2003).

**A. Discrimination Claim**

Plaintiff claims race and national origin-based discrimination in violation of Title VII and 42 U.S.C. § 1981. He alleges that "Plaintiff and other similarly situated minority Hispanic and African-American employees were incorrectly placed at a lower seniority than junior Caucasian employees." Compl. ¶ 31. To avoid summary judgment on his discrimination claims, whether under Title VII or section 1981, plaintiff must establish a prima facie case of discrimination as set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). See, e.g., Joseph v. Leavitt, 465 F.3d 87, 90 (2d Cir. 2006) (Title VII); Hargett v. Nat'l Westminster Bank, USA, 78 F.3d 836, 838 (2d Cir. 1996) (Section 1981). A prima facie case is established by showing (1) membership in a protected class; (2) satisfactory job performance; (3) an adverse employment

4

action;[3] and (4) circumstances giving rise to an inference of discrimination. See Demoret v. Zegorelli, 451 F.3d 140, 151(2d Cir. 2006) (citation omitted).

Here, the undisputed evidence regarding the Union's determination of plaintiff's relative placement on the Revisions List cannot establish an adverse employment action nor circumstances giving rise to an inference of discrimination to support a prima facie case. Plaintiff bases his claim solely on his belief that he was placed below two Caucasian members with less seniority. However, the undisputed evidence demonstrates that: (1) placement on the Revisions List is determined using a formula based on the number of shifts worked by an employee as a pressman during certain periods of time; (2) the Union determines the number of shifts an employee works from time records provided to it by the employer newspapers; (3) the New York Post provided the Union with the time records for plaintiff and other Post employees; and (4) according to those time records, plaintiff's position on the Revisions List is correct. See Supplemental Declaration of John Heffernan ("Heffernan Supp. Decl.") ¶¶ 6-7, Ex. B, C & D; Heffernan Decl. ¶ 14; Union's Statement Pursuant to Local Civil Rule 56.1 ("Union's 56.1 Statement") ¶ 13.

Plaintiff was given the opportunity in discovery to review the time records utilized by the Union and the formula applied to all Union members. At oral argument on the Union's renewed motion to dismiss, this Court urged plaintiff's counsel to fully examine those records to determine if plaintiff could validly maintain (1) that those were not the records provided by the

---

[3]The Union argues, in support of its motion, that plaintiff's relative placement on the Revisions List cannot constitute an adverse employment action. Since this Court concludes that plaintiff can show neither an adverse employment action nor circumstances giving rise to an inference of discrimination, the Court need not determine whether a lower placement on the list alone constitutes an adverse employment action.

New York Post, or (2) that the Union misapplied the applicable formula. Plaintiff has been

unable to make such a showing. He simply relies on allegations that there is an "inconsistency

between the Union's payroll records and Mr. Paulino's payroll records," and that further

"discovery might uncover evidence of animus or hostility toward Mr. Paulino on the basis of his

race." What plaintiff continues to avoid confronting is that the evidence is undisputed that the

Union received the records provided by the employer, and utilized the same formula used in

every case to determine the order of placement on the list. This critical threshold issue plaintiff

fails to address in his Rule 56.1 statement or his arguments. None of plaintiff's other arguments

or further requests for discovery could sustain a discrimination case in light of this undisputed

evidence.

    The Union provided plaintiff the time records. The Union also provided an explanation

of how plaintiff's—and the two white employees'—placement on the Revisions List was

calculated utilizing the standard formula applicable to all members.[4] Plaintiff, however, has

---

[4]When a casual employee—*i.e.*, not a Union member—works 110 shifts in a six-month period from either (i) January 1 to June 30, or (ii) July 1 to December 31, that employee is placed on a Shop Priority List. Union's 56.1 Statement ¶ 7. Once on the Shop Priority List, the employee is offered Union membership, and Union establishes that employee's Revisions List "date." Id. ¶¶ 7, 8. To establish the date, the Union looks to the number of shifts worked by that employee during the year before the period in which the employee was placed on the Shop Priority List. Id. ¶ 8. That number, up to 168, has a corresponding date—which is listed in a table—which is the employee's Revisions List date. Id. ¶ 9; Heffernan Supp. Decl. ¶ 4, Ex. A. If an employee worked more than 168 shifts in the previous year, the employee is given a full year's credit for purposes of placement on the Shop Priority List, and then the same procedure outlined above is followed to determine that employee's Revisions List date. Union's 56.1 Statement ¶ 9.
    For example, plaintiff earned his Union card on July 1, 2000, meaning he worked 110 shifts in the previous six-month period. Heffernan Supp. Decl. ¶ 7. During the prior year, however, plaintiff worked only 66 shifts. Id.; id. Ex. B. According the table that establishes the Revisions List date, 66 shifts has a corresponding date of August 9. Id. Ex. A. Thus, plaintiff's date was August 9, 1999. Id. ¶ 7.

never alleged that the standard formula was manipulated or applied differently in his particular case. In fact, at the hearing on the Union's motion, plaintiff's attorney acknowledged that Mr. Paulino's records are accurate employer records and that they were accurately transmitted to the Union for their evaluation. See Transcript of Oral Argument, April 5, 2006 ("Tr.") at pp. 27-28. Yet despite this admission, this Court gave plaintiff a further opportunity to review the time records received and utilized by the Union, so he could determine whether he could indeed challenge their accuracy. In an attempt to raise an issue regarding those time records, plaintiff responded by submitting a printout of plaintiff's payroll records which, according to plaintiff, demonstrate that he worked more hours than reflected in the records received by the Union. But these records in plaintiff's possession still fail to raise a genuine issue of fact as to whether the Union routinely utilized the records provided by the employer, or deliberately misplaced plaintiff on the Revisions List under circumstances giving rise to an inference of racial discrimination. He has failed to come forth with any evidence to raise a genuine dispute on this threshold issue.

Plaintiff does not claim that the payroll records in his possession were given to, or relied upon by the Union, when it determined plaintiff's spot on the Revisions List. Thus, even if these payroll records that plaintiff now wants to rely on proved that the time records provided to the Union from the Post were inaccurate, any resulting misplacement of plaintiff on the Revisions List would be the employer's fault, not the Union's. In addition, plaintiff's payroll records reflect shifts that plaintiff worked for the Post in capacities other than as a pressman—shifts that are not counted for purposes of placement on the Revisions List.[5] See Third Heffernan Decl. ¶

---

[5]The relevant work for purposes of placement on the Revisions List is work performed as a pressman in the pressroom. See Declaration of John Heffernan, sworn to May 17, 2006 ("Third Heffernan Decl.") ¶ 4(A). These work shifts are denoted by the numbers 10, 11, or 200 on the

4(A). According to plaintiff's payroll records, in 1999, plaintiff worked 66 shifts as a pressman

(from August 15, 1999 to December 31, 1999). Id.; Plaintiff's May 4, 2006 Letter

Memorandum, Ex. I. This is the same number of shifts reflected in the Post's time records used

by the Union in determining plaintiff's placement on the Revisions List. See Third Heffernan

Decl. ¶ 4(A); Heffernan Supp. Decl. Ex. D. Finally, according to the time records provided to

the Union by the Post, the placement of the two white employees on the Revisions List is also

correct, and plaintiff never contends otherwise. See Heffernan Supp. Decl. ¶¶ 6-7. Thus,

plaintiff's payroll records do not conflict with the time records relied upon by the Union.

Accordingly, there are no circumstances here to demonstrate an adverse employment

action, or from which an inference of discrimination can be drawn. Plaintiff does not contend

that defendant relied on any different records than were provided by the employer, or utilized any

method out of the ordinary to determine his placement on the Revisions List than is used in all

other instances. He merely continues to allege that his order of placement on the Revisions List

was not determined solely by the total number of hours he worked as a Union member, despite

clear evidence which he seeks to ignore and avoid, that such a simplistic formula is not applied to

his or any other Union member's placement on the list.

Since his placement on the list is supported by the evidence, there can be no adverse

employment action. Moreover, one cannot reasonably infer racial discrimination based on

---

payroll records submitted by plaintiff. Id.; Plaintiff's May 4, 2006 Letter Memorandum, Ex. I.
Plaintiff's payroll records, however, list shifts worked by plaintiff with a corresponding "Pay
Type" number other than a 10, 11, or 200. Plaintiff's May 4, 2006 Letter Memorandum, Ex. I.
The number of shifts that plaintiff's payroll record indicate that he worked at "Pay Type" 10, 11,
or 200 in 1999 is the same—66—as reflected in the time records provided to the Union by the
NY Post. Compare id. with Heffernan Supp. Decl. Ex. D.

plaintiff's contention that he should be ahead of two white union members on the Revisions List simply because plaintiff believes he has seniority. Plaintiff cannot merely rely on a separate set of records in his possession not provided by the employer to the Union, and his own "seniority" formula to support his discrimination claim. Plaintiff cannot sustain a prima facie case of employment discrimination under either Title VII or Section 1981, where the evidence remains undisputed that the Union made its placement calculation by utilizing its standard formula based upon the time records provided by the employer. Summary judgment is therefore appropriate.[6]

### B. Retaliation Claim

Plaintiff's Title VII and Section 1981 retaliation claims cannot survive dismissal. A prima facie case of retaliation under Title VII or Section 1981 requires proof that the plaintiff engaged in a protected activity; the employer was aware of this activity; the employer took adverse action against the plaintiff; and a causal connection exists between the protected activity and the adverse action, *i.e.*, that a retaliatory motive played a part in the adverse employment action. Schiano v. Quality Payroll Systems, Inc., 445 F.3d 597, 608 (2d Cir. 2006); Lizardo v. Denny's, Inc., 270 F.3d 94, 105 (2d Cir. 2001). Plaintiff never raised a retaliation claim with the

---

[6]Plaintiff was provided both the Union's time records and formula, and given the opportunity, and was urged by this Court, to verify its application. Plaintiff has apparently declined to do so. Instead, he further argues that summary judgment is premature because additional discovery "might uncover evidence of (a) animus or hostility toward Mr. Paulino on the basis of his race[;] (b) the inaccuracy of Mr. Paulino's placement on the list which determines the order of elevation to journeymen status[; and] (c) whether or not the Union's refusal to address Mr. Paulino's complaints were motivated by animus." But as already noted, at the April 5, 2006 hearing on the Union's motion, this Court granted plaintiff a further opportunity to review the time records received and relied upon by the Union, to determine whether plaintiff could claim that those records were not accurate or that the formula was misapplied in this case. Tr. 68-74. Thus, plaintiff has received, and had ample opportunity to investigate the accuracy of, the time records relied upon by the Union, yet he has still failed to even claim a disputed issue of material fact as their correctness.

Equal Employment Opportunity Commission, and therefore any Title VII claim is unexhausted.[7]
Plaintiff has not, and cannot, establish a prima facie case of retaliation under section 1981.

To the extent plaintiff claims that his membership was suspended in retaliation for his complaints regarding discrimination in placing employees on the revisions list, there is simply no evidence that plaintiff raised the issue of racial discrimination with anyone in the Union prior to his alleged November 2004 suspension. In fact, the only evidence plaintiff cites to support his allegation that he even complained about his relative placement on the Revisions List—two letters plaintiff sent to the Union President—do not contain any claims of discrimination at all. Rather, the letters are merely requests by plaintiff for an explanation of the formula used to determine placement on the Revisions List.

In addition, to the extent plaintiff claims that "[t]he Union suspended Paulino's Union membership based upon his election not to enroll in the cafeteria plan," that allegation cannot state a retaliation claim because refusing to sign a § 125 form is not a protected activity. See, e.g., Kessler v. Westchester County Dept. of Soc. Servs., 461 F.3d 199, 210 (2d Cir. 2006) (noting that a "protected activity" is one "opposing an employment practice made unlawful by Title VII") (citation omitted); Moore v. Consolidated Edison Co. of New York, Inc., 409 F.3d 506, 508 n.2 (2d Cir. 2005) (stating that retaliation claims are "cognizable under § 1981 where the allegations provoking the retaliation involved racial discrimination") (citations omitted).

---

[7] Filing of a complaint with the Equal Employment Opportunity Commission is a prerequisite to bringing a Title VII claim in federal court. See Williams v. New York City Housing Authority, 458 F.3d 67, 69 (2d Cir. 2006). Although plaintiff did file an EEOC complaint in this case, it focused solely on the Union's alleged discrimination in placing Caucasian employees ahead of minority employees on the Revisions List. See Declaration of Roger Carbo, Ex. A (the EEOC complaint). The complaint says nothing of any retaliatory actions taken against plaintiff.

10

Finally, even if plaintiff had engaged in a protected activity, he has not alleged an adverse employment action. An adverse employment action is one "that a reasonable employee would have found . . . materially adverse," meaning that the action "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." Kessler v. Westchester County Dep't of Social Services, 461 F.3d 199, 207 (2d Cir. 2006) (quoting Burlington Northern & Santa Fe Railway Co. v. White, --- U.S. ----, 126 S.Ct. 2405, 2415 (2006)).

Here, although plaintiff alleges that his Union membership was suspended, he does not dispute the fact that he remained eligible to vote in, and was provided a ballot for, Union elections even after the alleged suspension occurred. Plaintiff's Statement Pursuant to Rule 56.1 ¶¶ 20-21. Nor does plaintiff deny that he continued to pay his Union dues and was eligible to attend and participate in Union meetings and activities. Rather, plaintiff merely alleges that he was denied the right to raise his complaints at the December 6, 2004 Executive Board Meeting "unless and until Mr. Paulino enrolled in the cafeteria plan." Plaintiff's March 22, 2006 Letter Memorandum at 3. Being denied the right to raise complaints at one Executive Board meeting, however, cannot constitute such a materially adverse action that it would dissuade a reasonable worker from complaining about discrimination. Here, plaintiff does not claim that he suffered any other adverse consequences or loss of Union membership.

Plaintiff's retaliation claim therefore fails and must be dismissed.

### C. LMRDA Claim

Lastly, plaintiff further alleges that his membership was suspended by the Union without the benefit of a full and fair hearing, in violation of the LMRDA. Section 101(a)(5) of the

11

LMRDA provides that "[n]o member of any labor organization may be fined, suspended, expelled, or otherwise disciplined . . . unless such member has been . . . afforded a full and fair hearing." 29 U.S.C. § 411(a)(5). The Union argues that this claim should be dismissed because plaintiff failed to exhaust the Union's internal grievance procedures established by the Union's Constitution and bylaws. The Union further argues that plaintiff's claim must fail because his Union membership was never suspended.

Pursuant to the LMRDA, court's have discretion to require plaintiffs to exhaust internal union remedies before asserting their claim in federal court. See Maddalone v. Local 17, United Broth. of Carpenters and Joiners of America, 152 F.3d 178, 186 (2d Cir. 1998). In exercising that discretion, the courts "must balance the right of union members to institute suit against the policy of judicial noninterference in union affairs." Id. (citation omitted). Factors guiding this inquiry are "(i) whether union officials are so hostile to the employee as to eliminate the chance of a fair hearing; (ii) the adequacy of the internal procedures; or (iii) whether exhaustion would unreasonably delay the opportunity to obtain a judicial hearing on the merits of the employee's claim." Schermerhorn v. Local 100, Transport Workers Union of America, 91 F.3d 316, 325 (2d Cir. 1998) (citations and internal quotation marks omitted). Utilizing available Union grievance procedures should be encouraged.

Under the Union's Constitution, a member "who feels that an injustice has been done to him, shall first appeal to the President, then to the Executive Committee and the Local Union." Declaration of Michael Tortora ("Tortora Decl.") ¶ 8, Ex. A. In addition, the member may then appeal a decision affecting his or her rights to the International Union. Id. Ex. A. Plaintiff maintains that he complied with the Union's procedures by sending two letters to the Union

12

President, and then one letter to the International Union. But none of these letters addressed the claim that plaintiff seeks to assert here: that his membership was suspended without a full and fair hearing. See Plaintiff's Letter Memorandum, March 22, 2006, Ex. B, C & H. Instead, the letters to the Union President merely seek an explanation of the formula used to determine an employee's placement on the Revisions List. In the third letter to the International Union, plaintiff only complains that he has been denied access to the "mathematical equation," and that the Executive Board at its December 6, 2004 meeting refused to address his concerns with regard to this issue. Id.

In fact, plaintiff did not claim he was suspended or raise his LMRDA claim in this Court until September 5, 2005, when he sought—and was denied—permission to file his proposed second amended complaint in Paulino I. That was ten months after he claims his membership was allegedly suspended, and four months after he originally filed suit. Thus, since plaintiff himself failed to raise this claim in either a Union grievance procedure, or in the two prior complaints he filed in this Court, requiring plaintiff to exhaust his internal Union remedies would not unreasonably interfere with plaintiff's right to institute suit.

More importantly, the Union maintains that plaintiff's membership was never actually suspended, and, as discussed above, plaintiff does not seriously dispute this. Rather, plaintiff merely claims that he was denied the right to speak at an Executive Board Meeting. Moreover, plaintiff admits that he only belatedly learned of his suspension upon his subsequent review of the minutes from the November 1, 2004 Executive Board meeting. He merely asserts that since the meeting minutes state that he was suspended, it must be so. But that does not contradict the Union's position that despite the fact that the minutes erroneously report that four individuals,

13

including plaintiff, were suspended, plaintiff's membership was never suspended, and he continued to pay dues and enjoy member benefits. It was plaintiff's health insurance that had been automatically suspended due to his failure to sign up for the cafeteria plan or otherwise pay the premiums.[8] Plaintiff claims no other loss of benefits. Finally, plaintiff never alleges that he received any formal membership suspension notice, even though the usual procedure would be for the Executive Board to send a letter to the member notifying the member of a suspension. Tortora Decl. ¶ 5. Accordingly, plaintiff cannot assert a valid or exhausted LMRDA claim.

**CONCLUSION**

The Union's motion for summary judgment is GRANTED. All of plaintiff's claims are DISMISSED and this case is CLOSED.

Dated: New York, New York
     May 7, 2007

                                  SO ORDERED:

                                  _George B. Daniels_
                                  GEORGE B. DANIELS
                                  United States District Judge

---

    [8]According to the Union, it was the suspension of certain members' health benefits that was discussed at the November 2004 Executive Board meeting resulting from the failure to sign up for the cafeteria plan, not the suspension of plaintiff's Union membership. Union's 56.1 Statement ¶ 18. This accounts for the transcription error in the minutes for that meeting which merely reads "The Executive Board reports D. Paulino [and three other members] are hereby suspended." Plaintiff's May 4, 2006 Letter Memorandum, Ex. G.

14

**EXHIBIT B**

**AMENDED**

| CHARGE OF DISCRIMINATION | AGENCY | CHARGE NUMBER |
|---|---|---|
| This form is affected by the Privacy Act of 1974; See Privacy Act Statement before completing this form. | ☐FEPA<br>☒EEOC | 520-2006-03504 |

New York State Division of Human Rights and EEOC
State or local Agency, if any

| NAME (Indicate Mr., Ms., Mrs.)<br>Willie Malone, on behalf of himself individually, and as class representative of all other employees similarly situated | HOME TELEPHONE (Include Area Code)<br>718-589-4829 |
|---|---|
| STREET ADDRESS    CITY, STATE AND ZIP CODE<br>1060 Wheeler Avenue, Bronx, New York 10472 | DATE OF BIRTH<br>9-21-64 |

NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY, APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME (If more than one list below.)

| NAME<br>New York Pressmen's Union Number 2 | NUMBER OF EMPLOYEES, MEMBERS<br>15+ | TELEPHONE (Include Area Code)<br>212-691-2862 |
|---|---|---|
| STREET ADDRESS    CITY, STATE AND ZIP CODE<br>275 7th Avenue, New York, New York 10001 | | COUNTY<br>New York |

| NAME<br>The New York Post | TELEPHONE NUMBER (Include Area Code)<br>212-840-2530 |
|---|---|
| STREET ADDRESS    CITY, STATE AND ZIP CODE<br>1211 Avenue of the Americas, New York, New York 10036 | COUNTY<br>New York |

CAUSE OF DISCRIMINATION BASED ON (Check appropriate box(es))

☒RACE  ☒COLOR  ☒SEX  ☐RELIGION  ☐AGE
☐RETALIATION  ☒NATIONAL ORIGIN  ☐DISABILITY  ☐OTHER

DATE DISCRIMINATION TOOK PLACE
EARLIEST (ADEA/EPA)    LATEST (ALL)

X CONTINUING ACTION

THE PARTICULARS ARE (if additional paper is needed, attach extra sheet(s)):

(See attached)

| I want this charge filed with both the EEOC and the State or local Agency, if any I will advise the agencies if I change my address or telephone number and I will cooperate fully with them in the processing of my charge in accordance with their procedure. | NOTARY - (When necessary for State and Local Requirements)<br><br>I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. |
|---|---|
| I declare under penalty of perjury that the foregoing is true and correct.<br><br>Date Aug 23, 2006    Charging Party (Signature) _Willie J. Malone_ | SIGNATURE OF COMPLAINT<br>_Willie J. Malone_<br>SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (Day, month, and year) _Pamela Jae Eisner_ 8/23/06 |

PAMELA JAE EISNER
Notary Public - State of New York
NO. 02EI6117496
Qualified in Nassau County
My Commission Expires 10/25/08

RECEIVED
AUG 28 2006
EEOC-NYDO-ENFORCEMENT