**EXHIBIT B**

## Danny Engelstein

**From:** Danny Engelstein
**Sent:** Tuesday, February 26, 2008 4:20 PM
**To:** 'jdevenuti@laborlaws.com'
**Subject:** FW: Pressman Documents


Union
onse-Malone v Press


Ltr to EEOC re-
Malone v. Pres...


Master Junior
Priority List.pd...


Ltr to EEOC re
Pressman's Unio...

I am sending you copies of a letter dated October 19, 2006 to Spencer Lewis, the accompanying factual rebuttal (which has a number of exhibits, including the seniority lists), a letter dated January 16, 2007 to EEOC investigator Sean Olivera, and a November 2005 Revisions list posted in the shops.

You might also want to take a look at the letter I sent to Ian Sacks on or about December 20, 2007.

Yours

Danny Engelstein

-----Original Message-----
From: Richard Storm
Sent: Tuesday, February 26, 2008 2:33 PM
To: Danny Engelstein
Subject: Pressman Documents

--------------------------------
Richard Storm
Levy Ratner, P.C.
80 8th Avenue
New York, NY 10011
(212) 627-8100
(212) 627-8182
--------------------------------

The information in this e-mail message and any attachment(s) hereto is intended for the confidential use of the addressee(s) only. The information is subject to all applicable rights of privilege and confidentiality including the attorney-client privilege and/or attorney work-product. Recipients should not file copies of this e-mail with publicly accessible records. If you are not an addressee or an authorized agent responsible for delivering this e-mail to a designated addressee, you have received this e-mail in error, and any further review, dissemination, distribution, copying or forwarding of this e-mail and/or attachment(s) is strictly prohibited. If you received this e-mail in error, please notify us at (212) 627-8100 and permanently delete the e-mail and any attachment(s) immediately. You should not retain, copy or use this e-mail or any attachment(s) for any purpose, nor disclose all or any part of the contents hereof to any other person. Thank you.

Circular 230 Disclosure Notice: To ensure compliance with Treasury Department rules governing tax practice, we inform you that any advice contained herein (including in any attachment) (1) was not written and is not intended to be used, and cannot be used, for the purpose of avoiding any federal tax penalty that may be imposed on the taxpayer, and (2) may not be used in connection with the promoting, marketing or recommending to another person any transaction or matter addressed herein.

# LEVY RATNER, P.C.

**Attorneys at Law**
**80 Eighth Avenue**
**New York, New York 10011-5126**

Telephone (212) 627-8100
Telecopier (212) 627-8182

Richard A. Levy
Daniel J. Ratner
Daniel Engelstein ○
Gwynne A. Wilcox ♦
Pamela Jeffrey
Owen M. Rumelt ▪
Kevin Finnegan
Carl J. Levine
David Slutsky ▵
Allyson L. Belovin

Suzanne Hepner ♦
Ezekiel D. Carder ◇
César F. Rosado ▵
Dana E. Lossia ▾
Sara D. Newman ♦
Susan J. Cameron ▪

<u>Senior Counsel:</u>
Richard Dorn
Jennifer J. Middleton ♦
Paul Schachter ▫
Denise Reinhardt ▪

January 16, 2007

<u>Counsel:</u>
Anthony DiCaprio
Michael Steven Smith
David P. Horowitz †



<u>**VIA FACSIMILE**</u>

Sean J. Oliveira
Investigator
Equal Employment Opportunity Commission
New York District Office
33 Whitehall Street, 5h Floor
New York, NY 10004

    **Re:**    **Malone v. NY Pressmen's Union No. 2 and NYP Holdings, Inc.**

Dear Mr. Oliveira,

    This is to confirm the responses I provided you last Friday on the telephone to the questions raised in your letter dated January 12, 2007.

    First, according to paragraph numbered 1 of your letter, the Charging Party has alleged:

    that of the seven permit journeymen at the Post (four non-minorities and three minorities), the four non-minorities, i.e. Michael Tortora, Frank Rivera, Kevin Wilkinson and Frank Giambrone, were made Journeymen just prior to the transfer of 11 employees.

    The Charging Party is confused and completely incorrect. On or about April, 2005, twelve Post Juniors were made permit journeymen. Those Juniors were selected from the Post Junior Priority list in order of their position on the Industry wide Revision List. They were not made journeymen at the time because there were Juniors at other newspapers who were ahead of them on the Revision list.

    The following is a list of those twelve individuals and their place on the November 11, 2005 Revision list which was posted for all members to review. A copy is enclosed.

● Admitted in NY, MA and DC   * Admitted in NY, NJ and PA   ▪ Admitted in NY and DC   ▵ Admitted in NY and NJ   ♦ Admitted in NY and CT
◇Admitted in NY and CA   ▵ Admitted in NY and PR   ▾ Admitted in NY, NJ and CA   ▪ Admitted in NJ only   ▫ Admitted in NY, NJ and PR   † Admitted in NY and MA

LEVY RATNER, P.C.

Sean Oliveira
January 16, 2007
Page 3 of 3

The names and dates that the eleven Pressmen who transferred became Journeymen are listed below:

| Name | Month and Year Became Journeyman |
|------|----------------------------------|
| Edward Kennedy | December, 2001 |
| Kevin Benedicks | December, 2002 |
| Daniel Delaney, Jr. | April, 2003 |
| John Rigali | March, 2004 |
| Brian Santos | June, 2004 |
| Roy Hearfield | January, 2005 |
| Frank Martino | January, 2005 |
| James Lyons | January, 2005 |
| Erik Atlas | January, 2005 |
| Anthony Faulisi | July, 2005 |
| Michael Meyerson | November, 2005 |

Only Michael Meyerson appears on the November 11, 2005 Revision list in the second spot. The recommendation to make him a journeymen was made on October 3, 2005, which incidentally is more than 300 days before Mr. Malone filed this charge.

As we previously stated, the transfers were voluntary and subject to the Post's right to accept or reject any candidate. A number of candidates were rejected, all of them were white males. The one non-white male who sought a transfer, Brian Santos, was hired.

We hope this response answers your questions and further establishes that there is simply no discrimination in the work force and that the system of assigning work and positions is based upon strict seniority rules that operate neutrally and will be to the benefit of the now integrated workforce as it accumulates greater seniority.

Sincerely yours,

Daniel Engelstein

cc: John Heffernan

{W:\876\001\01\07004849.DOC}
203



# New York Newspaper Printing Pressmen's Union Number 2

275 Seventh Avenue, Suite 1500 · New York NY 10001

Phone   212-691-2862
Fax      212-691-2962

November 17, 2005

## PLEASE POST

Fm:         Revision Committee

Re:         Master Junior Priority Revision List November 11, 2005

Dear Brothers and Sisters:

Enclosed is a complete list of our Junior Membership; please check that your name, s .s. digits and date are correct. Corrections or inquiries should be forwarded to the Committee in care of the Union at the above address.

Juniors must work 169 shifts per calendar year except for sickness, authenticated leave of absence or military service.

This list of 162 juniors reviews their work records as supplied by the publishers for the year 2004.

Sincerely and Fraternally,


Revision Committee

Daniel MacPhee, Chairman

Anthony Cristiano

Edward Luczkiewicz

# PLEASE POST

Revision List 11-11-05.xls

| 41 | 01/28/00 | 9408 | COFFIN, THOMAS |
|----|----------|------|----------------|
| 42 | 01/29/00 | 8780 | CHAN, FAY |
| 43 | 02/20/00 | 2510 | LANOCE, RALPH |
| 44 | 02/21/00 | 0007 | HART, CHARLES |
| 45 | 02/28/00 | 0590 | CLEMENT, ANTHONY |
| 46 | 03/03/00 | 1230 | MICHAEL, JOY |
| 47 | 03/11/00 | 6011 | HERNANDEZ, ANGEL |
| 48 | 03/22/00 | 8193 | DiMATTEO, THOMAS |
| 49 | 03/24/00 | 9805 | QUERIM, JOHN |
| 50 | 04/09/00 | 5836 | BENEDICKS, PATRICK |
| 51 | 05/13/00 | 9187 | TORTORELLO, ANTHONY |
| 52 | 06/24/00 | 3890 | SCHANZ, THOMAS |
| 53 | 07/18/00 | 8583 | ABREW, ROBERTO |
| 54 | 07/23/00 | 9072 | TOMASELLO, JOSEPH |
| 55 | 08/12/00 | 4412 | EISEMAN, ROBERT |
| 56 | 08/13/00 | 0735 | KADIAN, BARBARA |
| 57 | 09/07/00 | 0829 | OLVESEN, ARTHUR |
| 58 | 09/18/00 | 1680 | CAREW, HOLDEN |
| 59 | 09/19/00 | 0974 | NG, SAM |
| 60 | 09/20/00 | 0728 | SIMONSON, DANIEL |
| 61 | 10/10/00 | 3650 | RICHARDS, THOMAS |
| 62 | 10/13/00 | 3196 | QUINN, THOMAS |
| 63 | 11/14/00 | 5258 | WHEELER, DANIEL JR |
| 64 | 11/15/00 | 5270 | CAPELLA, RONALD |
| 65 | 12/03/00 | 0803 | BRUNO, FRANK |
| 66 | 12/20/00 | 9019 | LEGUILLOU, ALEXANDER |
| 67 | 01/04/01 | 1811 | REILLY, KEVIN |
| 68 | 01/05/01 | 6285 | CARTER, JEFFREY |
| 69 | 01/06/01 | 6934 | McVEIGH, FREDERICK |
| 70 | 01/10/01 | 3560 | SCHILLER, MICHAEL |
| 71 | 01/12/01 | 4683 | MARTIN, MICHAEL |
| 72 | 01/18/01 | 2902 | WHEELER, DANIEL SR |
| 73 | 01/28/01 | 6712 | BANOFF, EDWARD |
| 74 | 02/01/01 | 7706 | TOMASELLO, WILLIAM |
| 75 | 02/09/01 | 7871 | BOTTIGLIERI, SALVATORE |
| 76 | 03/03/01 | 8173 | LOVE, CHRISTOPHER |
| 77 | 03/05/01 | 5396 | WATSON, JEROME |
| 78 | 03/09/01 | 8056 | WILSON, DESIREE |
| 79 | 03/20/01 | 4805 | TONNESEN, ERIC |
| 80 | 03/26/01 | 8009 | SCHIANO, ANGELO |
| 81 | 04/09/01 | 4787 | MARTINO, RICHARD |
| 82 | 04/24/01 | 8654 | WILSON, SHERRE |
| 83 | 05/03/01 | 9764 | KOCHENDORFER, MICHAEL |
| 84 | 06/13/01 | 3696 | WILSON, OLIVIA |

PLEASE POST

**PLEASE POST**

Revision List 11-11-05.xls

| 129 | 05/09/03 | 6866 | GUBELMAN, JOHN |
| 130 | 05/11/03 | 2078 | CAREY, PAUL |
| 131 | 06/16/03 | 0554 | CORDERO, ALBERT |
| 132 | 07/01/03 | 9519 | ORELLANA,  MARIO |
| 133 | 07/21/03 | 4369 | BOGAN, BARBARA |
| 134 | 08/03/03 | 3047 | MAC ALLISTER, JOSEPH |
| 135 | 09/06/03 | 7934 | OWENS, PAUL |
| 136 | 09/07/03 | 9898 | RYAN, JOSEPH |
| 137 | 10/03/03 | 3809 | DORDAL, PAUL |
| 138 | 10/09/03 | 4327 | TOTH, DAVID |
| 139 | 10/13/03 | 4547 | SILVERSTEIN, JASON |
| 140 | 10/22/03 | 8936 | ORTIZ, LIZA |
| 141 | 10/24/03 | 4956 | CIRABISI, STEPHEN |
| 142 | 01/01/04 | 4451 | LYNCH, MICHAEL |
| 143 | 01/02/04 | 8842 | STEIGER, RICHARD |
| 144 | 01/03/04 | 8271 | FEINMEL, RICKY |
| 145 | 01/04/04 | 2513 | BROCKINGTON, ERIC |
| 146 | 01/05/04 | 5799 | GONZALEZ, MARCO |
| 147 | 01/06/04 | 4734 | CLEMENT, CHRIS |
| 148 | 01/10/04 | 5616 | SCHIFANO, FRANK |
| 149 | 01/12/04 | 5299 | TAIBE, LOUIS |
| 150 | 02/01/04 | 1527 | BOTTOMLY, ROBERT |
| 151 | 02/09/04 | 7941 | BUSCEMI, SALVATORE |
| 152 | 03/13/04 | 8282 | MARINO, LOUIS |
| 153 | 04/28/04 | 6505 | INDRI, ALEX |
| 154 | 05/03/04 | 6857 | BANOFF, ALEXANDER |
| 155 | 06/28/04 | 8821 | CREVATAS, CHRISTOPHER |
| 156 | 07/07/04 | 1142 | DWYER, FRANCIS |
| 157 | 07/18/04 | 0560 | HOLBROOK, GUY |
| 158 | 09/22/04 | 9690 | BINDER, ROBERT |
| 159 | 09/29/04 | 1017 | HAWKSBY, JOHN |
| 160 | 10/07/04 | 1741 | FIORE, JOSEPH |
| 161 | 12/13/04 | 8937 | DE LUTRI, GARY |
| 162 | 12/18/04 | 4131 | CASE, ADAM |

**PLEASE POST**

# LEVY RATNER, P.C.

**Attorneys at Law**
**80 Eighth Avenue**
**New York, New York 10011-5126**

Telephone (212) 627-8100
Telecopier (212) 627-8182

Richard A. Levy
Daniel J. Ratner
Daniel Engelstein ○
Gwynne A. Wilcox •
Pamela Jeffrey
Owen M. Rumelt •
Kevin Finnegan
Carl J. Levine
David Slutsky ▲
Allyson L. Belovin
Jennifer J. Middleton ○

Suzanne Hepner •
Ezekiel D. Carder ○
César F. Rosado ▲
Dana E. Lossia ▼
Sara D. Newman •

**Senior Counsel:**
Richard Dorn
Paul Schachter ○
Denise Reinhardt •

**Counsel:**
Anthony DiCaprio
Michael Steven Smith
David P. Horowitz †



October 19, 2006

<u>**VIA OVERNIGHT MAIL**</u>

The Hon. Spencer H. Lewis, Jr.
Director of New York Region of
Equal Employment Opportunity Commission
33 Whitehall Street – 5th Floor
New York, NY 10004

Re:  <u>Charge No 520-2006-03503</u>

Dear Mr. Spencer:

We write, on behalf of the New York Newspaper Printing Pressmen's Union No. 2 ("the Union"), in response to the charge filed on August 28, 2006 by Walter Malone ("the Charging Party") with the New York Office of the Equal Employment Opportunity Commission ('the EEOC"). Also enclosed is a Factual Response to selected allegations in the charge and a packet of exhibits to which reference is made.

The crux of the charge is that the long-standing seniority system embodied in the Union rules and its contract with the NYP Holdings, Inc. d/b/a the New York Post (the "Post") which gives journeymen union members priority over junior union members for purposes of allocating work has a disparate impact upon women and minorities.[1]

The charge has at least four fundamental flaws aside from its many factual errors and mischaracterizations (see accompanying Factual Response):

- First, giving preference to union journeymen over union juniors pursuant to a longstanding bona fide seniority system is not unlawful under Section 703(h) of

---

[1] In order to prepare a meaningful response, we have thus attempted to frame what appears to be the most coherent statement of the central underlying issue embodied in the charge. Although not necessary to dismiss the charge, in the interest of completeness, we are submitting a separate Factual Response illustrating how the charge's wide ranging general allegations of wrongdoing are permeated with misstatements and mischaracterizations of the underlying facts or otherwise couched in terms which have no relation to reality. The exhibits referred to in this letter and the Factual Response are attached hereto.

{W:\876\001\08\06011999.DOC}
○ Admitted in NY, MA and DC   • Admitted in NY, NJ and PA   * Admitted in NY and DC   ▲ Admitted in NY and NJ   ◇ Admitted in NY and CA
• Admitted in NY and CT   ▲ Admitted in NY and PR   ▼ Admitted in CA only   □ Admitted in NY, NJ and PR   ■ Admitted in NJ only   † Admitted in NY and MA

LEVY RATNER, P.C.

The Honorable Spencer H. Lewis, Jr.
October 19, 2006
Page 2 of 10

Title VII, 42 U.S.C. § 2000e-5(h) where any alleged past discrimination in allowing women and minorities to become union members no longer exists;

- Second, as a result of neutral hiring practices over the last eight years women and minorities represent an increasing percentage of the union work force. The Post Junior Shop Priority List is thirty-five percent women and minorities and sixty-five percent white males, who are evenly distributed throughout the list. Like all union members they started out as juniors and will ultimately advance to journeymen status in the established order that has long governed the process. Any relative disparity in the proportion of women and minorities in the journeymen ranks as compared to the junior ranks is not a function of the seniority system, but the past barriers to the entry of minorities and women into that system. But now that entry level discrimination has been eliminated, the historical strict seniority system is the best insurance that all juniors, without regard to race, gender and/or ethnicity, will become Journeymen and inherit the very seniority benefits the Journeymen now enjoy.

- Third, the recent transfer of Journeymen to the Post, not only did not have a disparate impact upon minorities and women (because it affected all juniors if it affected any) but also compromise any contractual seniority right of the juniors on the Post Shop Priority List. All the Post juniors have been, and continue to be, provided a minimum of five (5) shifts a week; indeed, those who were on the Priority list as of August 1, 2004 are guaranteed that minimum. Other than to meet that guarantee, however, juniors have no right to work available journeymen shifts before a Journeyman from another newspaper. Thus, whether or not the transfers occurred, the outside journeymen would have had the right to work the additional journeymen slots before the Post juniors. The transfer was simply a logical and efficient way of staffing a substantial increase in work resulting from the so-called commercial agreement which provided for the transfers.

- Fourth, the industry wide seniority system not only provides women and minorities with an objective path to attaining Journeyman status, but it gives them certain priority for work opportunities which are demonstrably not based upon race, gender or ethnicity. Indeed, the system the Charging Party attacks permits him to work extra shifts at the Post ahead of white male juniors from other papers with considerably more industry seniority, as well the right to work at other newspapers ahead of outside white male juniors with less industry seniority.

LEVY RATNER, P.C.

The Honorable Spencer H. Lewis, Jr.
October 19, 2006
Page 3 of 10

## POINT I

### THE CHARGE'S DISPARATE IMPACT CHALLENGE TO THE LONG STANDING BONA FIDE INDUSTRY WIDE SENIORITY SYSTEM FAILS AS A MATTER OF LAW

#### A. The Applicable Legal Principles

Title VII specifically protects the operation of a bona fide seniority system. In the absence of continuing discriminatory hiring practices, a facially neutral seniority system is not unlawful because past discriminatory practices created a disparity in the ranks of the more senior employees. *Teamsters v. United States*, 431 U.S. 341 (1997). As one Justice explained:

> In *Teamsters* we stressed that "the unmistakable purpose of § 703 (h) was to make clear that the routine application of a bona fide seniority system would not be unlawful under Title VII... even where the employer's pre-Act discrimination resulted in whites having greater existing seniority rights than Negroes." 431 U.S., at 352. *See also California Brewers Assn. v. Bryant* , 444 U.S. 598, 600 (1980). Here, however, the Court of Appeals has premised a Title VII violation on just such a routine application. Surely little is left of *Teamsters* or indeed § 703 (h) if the results of the normal operation of a concededly bona fide seniority system may be used as proof of discrimination. In such a case the employer is found liable not for present racial discrimination but for complying with a seniority system. This is directly contrary to the intent of Congress, embodied in § 703 (h), and the opinion of this Court interpreting that provision in *Teamsters*.

*Procter & Gamble Mfg Co. v Fisher*, 449 U.S. 1115, 1117 (1981)(dissent from denial of writ of certiorari). *See also American Tobacco Co., v. Patterson*, 456 U.S. 63 (1982) (applying this rationale to seniority systems implemented after the enactment of Title VII). The Supreme Court cautioned that:

> a challenge to a neutral system may not be predicated on the mere fact that a past event which has no present legal significance has affected the calculation of seniority credit, even if the past event might at one time have justified a valid claim against the employer.

LEVY RATNER, P.C.

The Honorable Spencer H. Lewis, Jr.
October 19, 2006
Page 4 of 10

*United Airlines v. Evans*, 431 U.S. 553, 561 (1977).

The allegations in the charge here, including the complaint about the journeymen transfers under the so-called commercial agreement, present precisely the type of claim that the Supreme Court has held repeatedly would not render a seniority system unlawful.

### B. Any Improper Past Hiring Practices Have Long Since Been Remedied

The relative "disparity" in the proportion of women and minority in the ranks of journeymen as opposed to the now diversified juniors is not a function of the seniority principles by which juniors become journeymen, but is a result of the residual consequence of past discrimination in entry level hiring.

The Charging Party has not and cannot allege any facts which would show that any alleged current disparity is a result of ongoing intentional discrimination. The undisputed facts concerning the integration of the union ranks demonstrate that the past discriminatory hiring practices the EEOC challenged fifteen years ago have been fully remedied. Given that the seniority system consists of a mechanistic application of formulas based upon service in the industry, it can only act to maintain the diversity that the recent hiring has created.

In 1995, the EEOC entered into a Consent Decree with the Union concerning the hiring practices at the New York Times. The issue was not the seniority system that had been in place for decades and continues in material respects to this day, but the process by which women and minorities were able to become members of the bargaining unit and enjoy the benefits of that seniority system.

Specifically, the Decree focused on the discrimination in the allocation of extras shifts to non-bargaining unit workers, *e.g.*, casuals, which had a disparate impact on the proportion of women and minority casuals who accumulated enough shifts to become regular employees and thus eligible for union membership.

No challenge was made to the system of requiring a minimum number of shifts worked during specified periods as precondition to becoming part of the unit and a union member. The contractual provisions giving journeymen and juniors industry wide preference to extra shifts before they could be assigned to casuals.

Rather, the emphasis was on ensuring that, when, in the normal course, extra shifts were assigned to casuals, the assignment was not made in a discriminatory manner so as to exclude women and minorities from becoming bargaining unit members (*i.e.*, juniors).

LEVY RATNER, P.C.

The Honorable Spencer H. Lewis, Jr.
October 19, 2006
Page 5 of 10

The agreed upon method of ensuring this result, embodied in the Consent Decree, was for the Union and the Times to use their good faith efforts to ensure that at least twenty-five percent (25%) of the Juniors on the Times' Junior shop priority list were minorities or women and that at least twenty-five percent (25%) of the casuals on the Times' Casual list were minorities or women. *EEOC v. New York Times et al,* 196 F.3d 72, 78 (2d Cir. 1999).[2] This was to be done without compromising the existing seniority system or existing seniority rights of the then existing work force.

That existing rights were not to be compromised was reinforced by the Second Circuit in response to objections raised to proposal for enforcing the Consent Decree. The Court made clear that the good faith efforts did not encompass nor necessitate breaching existing seniority rights:

> We are loathe to say that a generalized good-faith-performance obligation in a consent decree overrides specific pre-existing contractual provisions known to the parties. *See Firefighters Local Union No. 1784 v. Stotts,* 467 U.S. 561, 574-75, 81 L. Ed. 2d 483, 104 S. Ct. 2576 (1984) (holding that consent decree would not be construed to depart from pre-existing union seniority system without express provision doing so). In the present context, it is precisely the provisions of the CBA giving various substantial priorities to Union members that are the greatest barrier to achievement of the statistical goals and that caused the parties to agree that a failure to meet the numerical goals would not by itself constitute a violation of the decree. Indeed, if the district court may rewrite the CBA at will, the goals can be quickly achieved.
>
> Moreover, we believe that where a decree does not invalidate such preexisting contractual provisions, appellants may incorporate such provisions in successive CBAs. Again, appellees and the district court had full notice of such provisions and of the common practice of

---

[2] As described in that case:

The decree's general goal is "to correct the statistical imbalance" of minority and female membership in the Union so far as Times' employees are concerned. Decree P 5. It specifically establishes "a goal of twenty-five percent (25%) minority and female representation on the Casual List and a goal of twenty-five percent (25%) minority and female representation among the [Times] Junior Pressmen." Id. P 12(a).

*Id.* at 78.



LEVY RATNER, P.C.

The Honorable Spencer H. Lewis, Jr.
October 19, 2006
Page 6 of 10

> new CBAs adopting provisions of earlier ones. However,
> where new provisions of a CBA give advantages to Union
> members over appellees, they must be justified by
> legitimate industrial or commercial reasons.

*EEOC v. New York Times et al*, 196 F.3d 72, 79 (2d Cir. 1999).

The disparity in the hiring of juniors that the EEOC sought to remedy by the Times Consent Decree no longer exists anywhere in the Union. About thirty percent of the Industry wide junior list are women or minorities. There are now about 50 women and minorities on the junior list alone as compared to almost none at the time the Consent Decree was imposed.

At the Post, where more hiring has occurred in the last six years, those percentages are even higher. About thirty-five per cent (35%) of the union members on the current Post Shop Junior list are women or minorities. *See* Exhibit A. If you look at the hiring over the last eight years, the percentage of women and minorities is even greater. Of the five persons remaining on the casual list only one is a white male. Thus, the pool for making additional juniors will only further diversify the work force and exceeds the goals set in the Consent Decree.

### C. The Long Standing Seniority System is Facially Neutral and is Unrelated to Race, Gender or Ethnicity

Contrary to the Charging Party's suggestion, the seniority system does not perpetuate discrimination. Rather, its mechanistic system operates to enhance diversification as it ensures that the fruits of the neutral hiring practices will be reaped as the juniors accumulate seniority and the current journeymen leave the industry.

The seniority system is part of the solution, not the problem, because of its objective nature. The seniority system that has, in material respects, been in place in this industry for decades was not devised as a means to discriminate against persons because of their gender, race or ethnicity. Race, gender or ethnicity could not have been considerations as the rules were developed in a totally homogeneous context and operated for decades in the entirely white male environment that existed prior to 1993.

The balance of seniority rights was based upon neutral choices of how, when and to what degree longevity would be rewarded. These choices were expressed in terms of mechanical measures of service that reserve first pick of the work opportunities for the most senior union members, and ultimately passes the benefits of that largess onto the junior members as the seniors retire and the juniors become journeymen. Even the process of determining when enough work exists to advance juniors (in their order on the list) to journeymen is the same as it was fifty years ago. The Union Executive Board

LEVY RATNER, P.C.

The Honorable Spencer H. Lewis, Jr.
October 19, 2006
Page 7 of 10

makes a recommendation when it believes that there is sufficient work to warrant additional journeymen and the recommendation is voted upon by the membership. It is this very strict reliance upon objective factors that will insure continued diversification rather than perpetuate any discrimination.

The Union did not substantially change its procedures or modify the order of hiring after its junior force became integrated. Nonetheless, for other reasons (e.g. turnover in the industry), the impact of the long standing seniority practices on today's juniors is less severe than when the work force was all white. The majority of those who attained Journeymen status twenty years ago waited for a considerably longer period than the juniors who have recently been made journeymen and those who will likely become Journeymen in the future. By way of example, the Union President John Heffernan waited 16 years before his turn came up to become a Journeyman. Similarly, the General Foreman at the Post, Raymond Walsh, had to wait 15 years. Moreover, the generation before Walsh and Heffernan averaged 20 years before becoming a journeyman. In contrast, the vast majority of the juniors on the Revisions List who are in line to become journeymen were made juniors in the last six or seven years.

If anything, the strict contractual hiring priority of the journeymen has been mitigated by certain guarantees that the Union has negotiated. All Juniors who were on the Priority list as of August 1, 2004 are guaranteed 5 shifts a week. See Exhibit C (June 15, 2004 Joint Conference Decision). The Guaranteed juniors are permitted to work as Journeymen before outside journeymen when necessary to meet those guarantees.

The seniority system and hiring order that exists today is nothing but a continuation of the lock step system that has existed for decades. The allegation that continuing the seniority system has an unlawful disparate impact because of the disparity in the journeymen ranks is precisely the kind of challenge precluded by Section 703(h), as interpreted by the Supreme Court in the *Teamsters* line of cases.

## POINT II

## ANY SENIORITY PREFERENCE GIVEN JOURNEYMEN AFFECTS WHITE MALE AND OTHER JUNIORS ALIKE

Because of the very integration of the junior ranks, both industry wide and at the Post, it is difficult to see how the impact of journeymen preferences could be said to target only women and minorities. In other words, if the Charging Party was adversely affected (which he was not) by the seniority preferences to which he objects, the adverse impact was not because of his race, but because of his status as a junior. Thus, similarly affected are the 42 white males on the Post Junior Priority List along with the more than 23 women and minority juniors. *See* Exhibit A.

LEVY RATNER, P.C.

The Honorable Spencer H. Lewis, Jr.
October 19, 2006
Page 8 of 10

**POINT III**

**THE RECENT TRANSFERS ARE PART OF THE INDUSTRY WIDE
SENIORITY SYSTEM AND IN NO MANNER VIOLATED ANY SENIORITY
RIGHTS OF THE POST JUNIORS, NO LESS OF MINORITIES AND WOMEN
AS A SEPARATE GROUP**

This Spring, 2006, eleven (11) journeymen (one of whom was a minority) transferred from other newspapers to the Post as part of an agreement between the Union and the Post to modify manning requirements for so-called "commercial" work and thus create more work opportunities. Exhibit "E." This transfer neither deprived anyone of work opportunities to which they were entitled nor was implemented for reasons having to race, gender and/or ethnicity.

The existing seniority system for assigning work applies to all press work, whether commercial or not. Industry Journeymen, whether at the Post or otherwise, had the contractual seniority right to work any additional journeyman slots created by the anticipated commercial work, so long as the Post Junior work force continued to be offered the opportunity to work five (5) shifts a week. Thus, other than where needed to provide those juniors who were guaranteed a minimum of 5 shifts a week (an integrated group that includes the Charging Party) juniors had no contractual right to unfilled journeymen slots before outside journeymen.

In this context, it is clear that the transfers were simply an orderly way of filling the overall increase in available journeymen slots that resulted from the influx of commercial work. The outside journeymen would still have the right to claim the work before juniors could work them as sixth shifts. The issue was whether it was better to fill those shifts with a stable work force by transferring outside journeymen and giving them regular situations or having those journeymen slots filled on a haphazard basis by journeymen who regularly work elsewhere and are seeking extra work. The former is obviously more desirable not only for the Post, but also for the Union.

Evening out the distribution of journeymen at the three newspapers increases the likelihood that there will be openings for the next juniors in line to become Journeymen. Transfers of Journeymen was historically part of the industry wide system. Even during the decades when the union work force was all white, the Union would seek to correct a disproportionate ratio of journeymen to juniors at a particular work force by transferring journeymen where there was room to do so. These transfers meant that journeymen would come ahead of juniors who may have already worked at that paper for years. From time to time the adversely affected white males challenged the transfers as unfair. But they were upheld as rationally related to the industry wide seniority system. *Ryan et al v. New York Newspaper Printing Pressmen's Union Local No. 2*, 590 F.2d 451 (2d Cir.

{W:\876\001\08\06011999.DOC}

LEVY RATNER, P.C.

The Honorable Spencer H. Lewis, Jr.
October 19, 2006
Page 9 of 10

1979) and *Farkas v. New York Newspaper Printing Pressmen's Union Local No. 2*, 312
F. Supp 161 (S.D.N.Y. 1970).The recent transfer of eleven (11) journeymen (one of
whom was a minority) from other newspapers to the Post is no different except that now
the affected junior work force is now integrated.

     In any event, regardless of its rationale, as argued in Point II above, this solution
to filling the additional journeymen slots had nothing to do with race, gender, or ethnicity
given the diversity in the ranks of the juniors both in the Post and elsewhere.

## POINT IV

### THE SENIORITY SYSTEM THAT THE CHARGE ATTACKS PROVIDES THE CHARGING PARTY WITH PRIORITY TO SHIFTS OVER WHITE MALES WITH MORE SENIORITY IN THE INDUSTRY

     As previously stated, the strict industry wide seniority system will ensure that, as
there is turnover, the diversification that resulted from neutral hiring practices will be
maintained.

     But even now, the seniority system provides priority preferences to the diversified
junior work force that are race, gender and ethnicity neutral.  By way of example, the
long-standing seniority system gives the Charging Party, who is an African American
black male, priority:

- at the Post over all outside Juniors, including more than forty (40) white male
  Junior union members with greater industry seniority, to work extra unfilled
  Journeymen and Junior shifts at the Post.

- to work extra unfilled junior slots at the News over about twenty-five (25) white
  male Junior union members with less industry seniority who work regularly at the
  Times and the Post.

- to work extra unfilled junior slots at the Times News over about thirty (30) white
  male Junior union members with less industry seniority who work regularly at the
  News and the Post.

     These are not abstract rights.  In addition to the six shifts the Charging Party has
worked at the Post, he regularly works at the Times where the wage scales are
considerably higher than at the Post.

{W:\876\001\08\06011999.DOC}

LEVY RATNER, P.C.

The Honorable Spencer H. Lewis, Jr.
October 19, 2006
Page 10 of 10

Whether one agrees with the system is not the issue. With a neutral hiring process producing an increasingly diversified work force, the system will operate without regard to race, gender or ethnicity.

## CONCLUSION

To the extent that in the past the discretion in hiring casuals had a disparate impact on women and minorities becoming Juniors and being put on the list to become Journeymen, that discrimination has been clearly and convincingly remedied.

What is left is the very situation presented to the Supreme Court in the *Teamsters* case: the continued operation of a mechanical seniority system whose only disparate impact on women and minorities is a function of past discrimination resulting in a smaller proportion of women and minorities among the more senior employees (in this case the journeymen). If anything, the continued operation of the seniority system will ensure that going forward the group that becomes Journeymen will be as diversified as the junior pool from which Journeymen are elevated.

The dismissal of the charge is thus not only mandated by Supreme Court's holding that the impact of past discrimination does not render a bona fide seniority system unlawful, but also by common sense. It is illogical to dismantle the advantages, even if viewed as unfair to more junior employees, of being a journeymen just as the group, which includes an increasing proportion of women and minorities, are on the cusp of becoming journeymen.

Respectfully Submitted,

Daniel Engelstein

Encl.
cc: John M. Heffernan (w/encl.)

**In the Matter of the Charge by William Malone against New York Newspaper Printing Pressmen's Union Number Two**

### Case No. 520-2006-03503

### THE UNION'S FACTUAL RESPONSE ILLUSTRATING THE MISLEADING AND ERRONEOUS NATURE OF THE CHARGING PARTY'S ALLEGATIONS

As we demonstrate in the Union's position statement, the underlying theory of the charge fails as a matter of law. Nonetheless, to assure that the factual allegations in the charge do not confuse the situation or create any doubt that the previous discriminatory hiring practices have not been corrected, we are providing this rebuttal. Our purpose is not to address every misstatement or to do so in depth, but only to illustrate with the following examples the degree to which the charge is permeated by misstatements and mischaracterizations.

### Paragraph 3 of the Charge

#### *Allegation (first sentence)*

"Respondents have engaged in certain practices which have the intent and effect of excluding women, blacks, Hispanics and Asian employees from achieving Journeyman status, by limiting their opportunities to work and thereby obtain Union membership and seniority to become a Journeyman ..."

#### *The Facts*

The allegation about limiting work opportunities to preclude women and minorities from "obtaining Union membership," can only refer to the process by which employees working as casuals become regular full-time employees and thus eligible to become union members. Casuals make this transition automatically when they work a set number of shifts at a particular newspaper in either the first or last six months in any calendar year. Once a casual achieves that threshold, he or she is put on the shop priority list as junior pressmen, becomes part of the bargaining unit and is eligible for Union membership. *See fn 5, infra.*

Casuals have no contractual right to work any amount of shifts. The shifts that casuals work are only those which need to be filled because there are no available journeymen or juniors to work them. And when such an opening occurs, the persons on the casual list have no contractual or other right to be hired in any particular order. Since 1998, management has done the hiring of casuals at the Post. Only when the casuals become juniors and part of the bargaining unit are they covered by the contract and have seniority rights to employment.

As noted in the covering letter, some fifteen years ago the EEOC alleged that women and minorities were discriminated against in the allocation of the work available to casuals resulting in an almost complete absence of women or minorities among the ranks of junior union members. The EEOC did not challenge the system of when work was made available to casuals, the requirement of a threshold minimum of shifts to become a regular employee, or any other aspect of the industry system of allocating work, including the age-old procedure by which juniors were promoted to Journeymen. Indeed, the EEOC was not seeking to change the seniority system which was in place and still exists in materially the same form today

The issue for the EEOC was that the discretion exercised in assigning open shifts to casuals operated to prevent women and minorities entering the system. As described in the covering letter, that discrimination has long since been remedied not only at the Times, the only employer covered by the Consent Decree, but throughout the industry. Both the Industry Wide and Post Shop Priority Junior Lists are completely integrated.

## Paragraph 3 of the Charge

### Allegation (second & third sentences)

"As a result of Respondents' discriminatory practices, there is a startling statistical imbalance of minorities and women employed as Journeymen at the New York Post. Thus, there are no female Journeymen at all and almost no minorities employed as Journeymen or Foremen"

### The Facts

### Females and Minorities Regularly Work as Journeymen

Contrary to the Charge's allegation, women and minorities on the Post Shop Priority List, whether journeymen or juniors, regularly work in journeyman slots and receive journeyman wages. There are seven women and minorities out of the 43 union members on the Post Shop Journeymen Priority List, all of whom have regular journeyman situations (i.e., their regular 5 shift work week are in journeymen slots). See Exhibit B (spreadsheet of the current Post journeymen Priority List). One of the women is regularly assigned the so-called pressmen in charge position, which carries with it a premium over the journeyman scale.

In addition, juniors who are on the Post Junior Shop Priority List are regularly scheduled to work as journeymen in accordance with tiered contractual seniority system of allocating open shifts at the Post. See ¶ 5 of Exhibit "D" (the June 15, 2004 Joint Conference Decision).

On any given day a substantial percentage of journeymen slots are filled by union members who are not white males. The Charging Party, for example, who is midway on

the Post Junior Shop Seniority List, works in journeyman slots more often than he does in a junior slot.

### The Contractual Order for Filling the Required Openings on a Particular Shift

There are two components to filling the available shifts on any given day. The first is the number and classification of openings. The second is the order in which those openings are filled.

The number of pressmen hired to work on any given shift is determined by the manning schedules in the contract with the Post. There are manning schedules for the running of the presses and a separate schedule for their cleaning and maintenance. The production manning for a particular shift depends upon the number of presses and reels that are being utilized. The manning is broken down into how many journeyman and junior slots there will be on a given shift. One of the journeymen slots is designated as the "Pressman in Charge" ("PIC"). This past May, 2006, in order to make economically feasible to attract work other than the printing of the New York Post, the parties agreed to a modified production manning schedule for the printing of so-called commercial work on the underutilized day shift. *See* Exhibit "E" (the May 18, 2006 "Commercial" Agreement").

The wage rates for Journeymen and the PIC slots premium are fixed and whoever works them is paid at those rates, regardless of whether he or she is a Journeymen or a junior.[1] The wages paid to juniors working in a junior slot, however, vary depending upon the years of service.[2] Only juniors can fill the junior slots.

Hiring is done in seniority order. Every two weeks, there is a schedule in which the anticipated manning slots are filled to provide each employee on the Post Shop Seniority List with a minimum of 5 shifts of work a week. Anyone on the Post Shop Priority List as of August 1, 2004 is guaranteed a minimum of 5 shifts of work a week (called a situation). *See* Exhibit "C" (the June 15, 2004 Joint Conference Agreement). Almost all of the current juniors are covered by the Guarantee.

The available shifts are filled in accordance with the following order. *Id.* at ¶ 5. First, the junior slots are filled with the available juniors on the Post Shop Priority List with the least seniority. Second, the Journeymen slots are filled by employees on the Post Journeymen Shop Priority List and, to the extent necessary to meet the Guarantees, available Guaranteed Juniors. Third, outside Industry Wide Journeymen are entitled to fill any remaining vacant journeymen slots (provided that they are not scheduled to work at their own shop). Fourth, any uncovered Journeymen slots are offered to the juniors

---

[1] The only exception is if a casual works the shift. Casuals are paid the same rate regardless of the slot they are working.

[2] There are eight junior rates, each one a higher percentage of the Journeyman rate. The top rate is at 98% of the journeyman rate. Every year a junior moves up to the next rate.

who had been assigned initially to the junior slots. Fifth, the junior slots opened up as a result of step 4 are filled first by Post Juniors seeking a sixth shift, juniors from another paper seeking extra work, and, if still unfilled, by casuals or, if no casuals are available, other persons who either shape (come to the Post looking for work) or have made their availability known to the Post.

The only difference from the historical system of hiring is that the Post is permitted to assign Guaranteed Juniors ahead of outside journeymen seeking additional work to journeymen slots when necessary to meet the guarantee.

## Paragraph 6 of the Charge

### *Allegation*

"Each collective bargaining agreement between the Union and the newspapers sets forth two (2) separate classifications of employees that perform work in the pressroom. Journeymen are senior employees who run the newspaper presses. Junior Pressmen, who are less experienced, assist the Journeymen in running the presses."

### *The Facts*

This paragraph is misleading to the extent it suggests that all, or even most, of the pressmen who have not achieved journeyman status at the Post only "assist" journeymen, perform less skilled functions, and/or work at lower wage rates. As noted above in response to paragraph 5, the contract provides the manner in which the required jobs are filled. Juniors routinely work in Journeyman slots and at journeyman wages.

## Paragraph 8 of the Charge

### *Allegation*

"Pursuant to the collective bargaining agreement, a Union member becomes eligible to be employed as a Journeyman at the satisfactory conclusion of his term of apprenticeship and provided he passes a test designed and coordinated by the Union. ..."

### *The Facts*

First, as described above, any junior can work in a journeyman slot and receive journeyman's pay as long as the slot is filled in accordance with the contractual hiring order. And as noted above, many of the journeyman slots at the Post are filled by juniors on a daily basis.

Second, as far as being promoted to Journeyman status, the Charging Party does not distinguish been the different rules that apply to being placed on the Post Journeymen

Shop Priority List and those that apply to achieving Full Industry Wide Journeyman status. We briefly describe the process for each below, starting with the latter.

### Industry Wide Full Journeymen

Industry Wide Journeymen are made from a list of all the Union juniors working in the industry in order of their "Revision Date." This list is referred to as the "Revisions List." Juniors' initial Revision Date is based upon the date they became a junior, with no more than 4 years retroactive credit for prior calendar years in which they worked 168 or more shifts. To maintain that Revision Date and thus, one's order on the Revisions List, a junior must continue to work at least 168 shifts each calendar year unless there is a valid medical excuse. Juniors who fail to work the required number of shifts, without being excused for medical reasons, will have their Revision Date adjusted and will be accordingly lower down on the Revisions List and that much further from being made a Journeyman.[3]

Although juniors are considered in order of their place on the Revisions list, there is no automatic time period after which juniors are made Industry wide Journeymen. The decision on when and how many juniors are to be made journeymen is a decision made by the Union membership based upon a recommendation of the Union's Executive Board. That decision is a function of whether there are sufficient available journeymen situations to absorb additional journeymen on a permanent basis.[4]

The Charging Party has not and cannot allege that the decisions as to when journeymen will be made are in any way related to race, gender or ethnicity. As the existing Journeymen retire, more Full Industry Wide Journeymen will be made. As the now diversified ranks of juniors become more senior, they also will become Journeymen and enjoy the benefits of the system that limits the number of Journeymen so as to maximize their work opportunities.

### Journeymen Status at the New York Post

There are currently 43 employees on the Post Journeymen Shop Priority List. Exhibit A. Thirty-six (36) of them are Full Industry Wide Journeymen. The remaining seven are "permit" journeymen who have for most purposes the same rights as Full Industry Wide Journeymen as it relates to work at the Post. Because they are not Full Industry Wide Journeymen, permit journeymen, as is the case with juniors, can only seek work as juniors outside the Post.

---

[3] As a practical matter, juniors on The Post Shop Priority List, either by virtue of the guarantee or the available work, all have a regular situation and thus, unless they fail to come to work should not experience a negative adjustment in their place on the Revisions List.

[4] There is and has been a requirement that before actually becoming a Journeyman must pass a Union Journeymen test. This requirement is administered and imposed by the International and has never presented any obstacle to anyone becoming a journeyman.

The strict seniority order of making Full Industry Wide Journeymen sometimes creates a logjam when the most senior juniors work at papers where there are no available journeymen openings based upon the current staffing. For decades the Union has used at least two ways of mitigating the impact of such a logjam when, at another newspaper, sufficient journeymen shifts existed to absorb additional journeymen situations.

One way has been to transfer Full Industry Wide Journeymen to the paper where there is room for more journeymen. The other is to make the most senior juniors at that newspaper on the shop priority list "permit" journeymen. This takes an action of the Union. The Executive Board recommends and the membership confirms any such decisions to make permit journeymen at a particular paper. The status is not permanent and must be renewed and was never intended to be a substitute for avoiding the Revisions List.

The Post and the Union agreed on June 19, 2002 that juniors would be eligible to be made permit journeymen after an undefined four year training program. See Exhibit "D" (The June 19, 2002 Agreement). Again this is not automatic. Nothing requires the Union to recognize them as permit journeymen at any time. Nor is permit journeymen status dependent upon passing the International Journeymen test, as Charging Party alleges. Rather the contractual agreement provides for an undefined training program, which because of disputes between the parties over related matters, consists largely of on the job training.

If, when and for the period during, the Union agrees to accord "permit" journeymen status, the permit journeymen under the June 19, 2002 agreement would be placed on the New York Post Journeymen Shop Priority List. See Exhibit B. Currently there are seven (7) permit journeymen on the Post Shop Journeymen Priority list. Three of them are either women or minorities, or both.

**Paragraph 9 of the Charge**

### *Allegation*

"The Joint Apprentice Committee, (a joint union-publisher committee established by the publisher's collective bargaining agreement with the Union), maintains a city-wide revisions priority list of all Permit Pressmen. A member's placement on the list determines when he/she may be eligible for advancement to Journeymen's status."

### *The Facts*

### **The Description of the Revisions List is Inaccurate**

The Charging Party again misunderstands the system by which the various industry and shop priority lists are maintained. As described above in response to the allegations contained in paragraph 8, the Revisions List is an industry wide list of all

juniors. It is not limited to permit journeymen and permit journeymen status does not affect the order in which juniors may be considered for Industry Wide Journeymen status.

## The Union, not the Joint Apprentice Committee, Maintains the Revisions List

The Charging Party is correct that there used to be a single Joint Apprentice Committee for the industry. At some point, the Post decided that the Joint Apprentice Committee provision in the Post contract entitled the Post to its own separate committee. The Post does not officially recognize the Joint Apprentice Committee consisting of representatives of the Union and representatives from the News and the Times. Rather, the Post convenes, without the Union's participation or agreement, its own Joint Apprentice Committee.

Although the Union has found it necessary and expedient to deal with issues covered by the Joint Apprentice Committee by discussing them separately with the Post, it has never officially recognized the Post's claimed entitlement to a separate Joint Apprentice Committee. *See, e.g.* Exhibit "D" (the June 19, 2002 Agreement).

Without ever having to resolve the issue of whether the Post is entitled to its own committee, the Post and the Union have generally worked out any conflicts between the industry system and that at the Post, without prejudice to their respective positions regarding the existence of a separate Post Committee.

The Charging Party is also mistaken that the Joint Apprentice Committee ("JAC") maintains the city-wide Revisions List. The JAC's function is to certify, based upon the relevant payroll records, when a casual had worked often enough to be placed upon the shop priority list as a junior and given a regular situation.[5] The JAC also determines in accordance with a longstanding formula based upon shifts worked what a junior's initial seniority date for purposes of placement on the shop priority list. The JAC date can be up to four years before the date someone became a junior to the extent that during that preceding period he or she had continuously worked 41 shifts a year. This date determines the order on which the junior is initially placed on the Shop Priority List (as well as the priority among juniors seeking to work extra shifts at other newspapers).

The Revisions List, however, is maintained by the Union alone. The Revision List is used to establish and to adjust a junior's "date" (i.e. the order) when he/she would be eligible to be advanced to Journeymen's status. Thus, once an individual is placed on a shop priority list, the Union's Revisions Committee establishes a "date" for that person, which is used to determine the order in which juniors (on a citywide basis) are eligible to be advanced to Journeymen status. When establishing the initial "date", the Union's Revision committee reviews the number of shifts that were worked by the junior when

---

[5] This occurs after a casual employee works a set number of shifts (previously 110, now 124) at a specific newspaper during either of the following 6 month periods: (i) January 1 to June 30, or (ii) July 1 to December 31. At that point, the individual becomes a regular situation holder, is placed on the Shop Priority List as a junior in order of their JAC date and is offered Union membership.

he/she was a casual and gives that individual credit for those shifts for purposes of establishing the "date" according to a formula that has existed for at least 50 years and is described above in response to paragraph 8.

### Paragraph 10 of the Charge

#### *Allegation*

"When an individual is placed on the newspaper priority list, the Union establishes a date for that person, which is used to determine the order in which Permits are supposedly eligible to be advanced to Journeymen status. The member's date or placement on the list is based upon the number of shifts worked by the Permit when he/she was a casual."

#### *The Facts*

As described above, the Charging Party's reference to "permits" is inaccurate. Otherwise, the process for determining the initial Revision Date is described in the responses to paragraphs 8 and 9.

### Paragraph 11 of the Charge

#### *Allegation*

"The 2000 Union By-laws established the right of all apprentices to become Journeymen. The By-laws were amended in 2001 to reflect the President of the Union would now make Journeymen as he sees fit."

#### *The Facts*

The Union by-laws relating to the process described above do not delegate to the President the right to make Journeymen as he sees fit. To the contrary, the process which has been the same for decades is that the Executive Board's recommendation must be acted upon and adopted by the membership.

### Paragraph 12 of the Charge

#### *Allegation*

"Since in or about January, 2006, Respondents have used non-minority Journeymen from other newspapers to work at the Post, thereby depriving minority and women employees at the NYP of opportunities to work and gain seniority and eventually to qualify as Journeymen."

*The Facts*

As described above in the second response to the allegations in paragraph 3, the contractual hiring order gives the outside Journeymen priority over Post Juniors to Journeymen shifts at the Post, once the Post juniors have been given the opportunity to work 5 shifts that week.

Also inaccurate is the statement that the juniors' seniority for purposes of becoming Journeymen is somehow affected. The Post Juniors, whatever their gender, race or ethnicity, whether as a result of the guarantees or available work, all have the opportunity to work 5 shifts a week, more than enough shifts to meet the 168 shift annual threshold needed to maintain their place on the Revisions List from which juniors are made Journeymen. (See Response to paragraph 8).[6]

**Paragraph 13 of the Charge**

*Allegation*

> "In or about March 2006, the Union and NYP management agreed to
> transfer twelve to fifteen (12-15) non-minority Journeymen from the Daily
> News and Times to work on a special "commercial work" at the NYP
> facility in the Bronx. ... The non-minority Journeymen transferees have
> displaced minorities and women at the NYP, thereby depriving them of
> shifts to which they would otherwise be entitled. The use of non-minority
> transferees has eliminated work opportunities relating to the special
> project for minorities and women at the NYP, thereby preventing
> minorities from attaining the requisite number of shifts to qualify as
> Journeymen."

*The Facts*

To start, the Charging Party is wrong about the number of transfers and whether any minorities were among them. Eleven Journeymen transferred. The one minority union member who asked for a transfer was hired. The transfers did not materially affect the percentage of white males working at the Post who were Industry Wide Journeymen. Before the transfer the ratio was 2 out of 25 or 8%. After the transfer, the ratio was 3 out of 36 or 8.5%.

In addition, the transferred journeymen did not deprive any union member at the Post of a single shift to which they were entitled. The transfers were part of an agreement

---

[6] Parenthetically, the number of years that juniors currently have to wait to become Journeymen is significantly less than when the Union members were all white males. It was not unusual for those who are at top of the current Industry Wide Journeymen List to have waited as many 15 years to become Journeymen. In contrast, there are minorities on the Post Shop Priority List who became Journeyman after waiting considerably less time. Whether that trend will continue will be a function of a number of factors, including attrition on one hand and whether the amount of work in the industry contracts on the other.

dated May 18, 2006 to modify the production manning for so called "commercial work." Exhibit "E". This was done in order to attract additional printing work which in turn would create additional work opportunities for pressmen. In fact, the transfers were specifically linked to the additional work coming in.

As previously stated, other than to meet the shift guarantee, outside journeymen seeking extra shifts at the Post have preference to unfilled Journeymen slots over Post juniors. Both before and after the Post started production under the commercial agreement and the transfers took place, all the Post juniors were receiving, and continue to receive, the opportunity to work five (5) shifts a week.[7]

As a result, outside Journeymen had priority to any additional journeymen shifts before the Post juniors were entitled to work those shifts as a sixth shift. This would have been the case even if there had not been any transfers. The only difference is that the shifts would be filled on an ad hoc basis, instead of by regular situation holders.

The Post preferred a stable workforce and the Union wanted to alleviate the logjam of Journeymen at the other papers. Thus, rather than filling the increased journeymen spots with an every changing assortment of available outside journeymen, a number of additional journeymen situations were created and filled by transfers who became part of the Post's regular work force.

Although the agreement provides for a total of fifteen transfers, the additional four transfers cannot occur until there is sufficient work to meet the guarantees for the existing juniors. When that happens, and even after those transfers are made, outside journeymen will have priority to any unfilled journeymen slots (whether working on commercial or newspaper production) over Post juniors who have been scheduled for five shifts that week.

In sum, no junior has been deprived of any shifts to which they are entitled. They all are getting their five shifts a week and any additional shifts to which their priority entitles them. Moreover, there would be no impact on "attaining the requisite number of shifts to qualify as Journeymen" as the 5 shifts a week is sufficient to maintain a junior's position on the Revisions List. *See* response to paragraph 12.

Finally, as noted previously, the transfer of journeymen to shops where there are openings for additional journeymen situations has historically been integral to the industry wide seniority system. The transfers affect all juniors, not just minorities and women. Any diminution of seniority rights would affect as many white male juniors as minority and women juniors given the evenly distributed diversification of the priority list.

Indeed, transfers were made when the industry was all white. Although from time to time transfers were challenged by white male juniors, mostly they were accepted as

---

[7] The allegation in paragraph 14 fails for the same reason.

part of the system of maximizing work opportunities for industry journeymen. For example, scores of Journeymen were transferred into the Times ahead of Union President John Heffernan during the fifteen years he waited to become a Journeyman.

**Paragraph 15 of the Charge**

*Allegation (first sentence)*

"Upon information and belief, eighty (80%) of the Journeymen currently working at the NYP have been transferred from the Daily News in the manner set forth above (referring to the commercial agreement)."

*The Facts:*

The Post Journeymen priority list has 43 names. Eleven were transfers made in accordance with the commercial agreement. Most of the remaining 36 employees became juniors at the Post.

**Paragraph 15 of the Charge**

*Allegation (second sentence)*

"None of the Journeymen or permit-Journeymen working at the NYP are women."

*The Facts:*

There are two women working as permit journeymen.

*Allegation (third sentence)*

"In fact, the vast majority of women working at the NYP have not received a Union card."

*The Facts*

All members of the bargaining unit have joined the union and received their cards. Aside from the two (2) female permit journeymen, there are seven (7) other women on the Post Junior Shop Priority List and who, like everyone else, when they became juniors and members of the bargaining unit, joined the Union.

*Allegation (fourth sentence)*

"There are no minorities or women who hold leadership positions in the Union."

*The Facts*

This is untrue. The Union has representatives who work at the various newspapers. These positions are elected. Aside from the Chapel Chairmen, who is the equivalent of Chief Shop Steward, there are separate representatives on each shift for the Juniors and for Journeymen.

At each newspaper, there are junior representatives who are women and/or minorities. For example, at the Post Stephen Fuentes is a junior representative; at the Times Ann Bryant is a junior representative; and at the News Luis Ortiz is a junior representative.

*Allegation (fifth sentence)*

"Almost no minorities are full Journeymen at the NYP"

*The Facts*

As noted previously, of the forty-three employees on the Post Shop Journeymen Priority List, thirty-six (36) are full Industry Journeymen and seven (7) are permit journeymen. Three (3) of the full Industry Journeymen are minorities and three (3) of the permit journeymen are either women, minorities or both. See Exhibit B.

**Paragraph 16 of the Charge**

*Allegation*

"Upon information and belief, the Respondents have increased the testing/certification requirements in order to impede the advancement of minorities and women to Journeymen status."

*The Facts*

Taking advantage of the available technology, the Union's International introduced a new on line journeymen training and testing program more that a year ago. Juniors can take the course and test as often as they like. The International Union requires that Journeymen pass this test to achieve full Journeymen status, not only for industry wide purposes, but in order to transfer to another Pressmen local. Passing the course is not required to be a permit journeyman at the Post or elsewhere.

Moreover, white males are not exempted from this requirement. There is no evidence that this requirement, even if a heightened one, is more of an impediment to any group of juniors identified in the charge as being discriminated against. The suggestion that the training program forced upon the Local by the International is more difficult for women, Hispanics or people of color is insulting

and without any basis in fact. Upon information and belief, white males do not as a group score higher on the test.

## Paragraph 17 of the Charge

### *Allegation*

"Upon information and belief, the apprentice category is heavily populated by minorities and females."

### *The Facts*

As the attached Post Junior Shop Priority List shows, of the sixty five (65) juniors on the list, twenty-three (23) are either women or minorities or both. *See* Exhibit A. There is also an even distribution on the list. The Charging Party is number 33 out of 65 and there are about as many white males above him and below him on the list.

## Paragraph 19 of the Charge

### *Allegation*

"Respondents' practices are intended to circumvent the priority list and prevent minority and women employees at the NYP from attaining Journeymen status, and have resulted in a statistical imbalance of minorities and women employed as Journeymen at the NYP. Respondents' actions have had the intention and effect of curtailing available opportunities for minorities and women, causing these groups to almost non-represented as Journeymen."

### *The Facts*

As demonstrated in the covering letter and in this response, the seniority system for determining priority order for work allocation and consideration for elevation to Journeyman status is virtually mechanical and has not changed materially since it was developed in the context of all white work force.

Also as previously shown, minorities and women have attained journeymen status at the Post and even as juniors consistently work in journeymen slots. Indeed, when the Union approved the making of "permit" journeymen at the Post, three of the seven permit journeymen were either women, minorities or both. *See* Exhibit "B" (Spreadsheet listing the employees on the Post Journeymen Shop Priority List).

**Paragraph 20 of the Charge**

*Allegation*

"The increased requirement [from 110 to 124 shifts] has a disparate impact upon minorities and women and have prevented them from gaining Union membership, a necessary step to be elevated to apprentice."

*The Facts*

The increase applies to all newspapers. It was implemented at the Post starting with the six month period ending December 31, 2006. Thus, it could not have possibly affected anyone to date. Nor is there any evidence that the additional 14 shifts required to become a junior will make any difference with respect to the five persons, one who is a white male, on the current Post casual list when the current six month period finishes.

**Paragraph 21 of the Charge**

*Allegation*

"The Union and the NYP intentionally favor non-minority male casuals over minority and female casuals in the selection of casuals from the "shape." Some minority and women employees have been given only one (1) shift per month, even thought they have appeared a the "shape" seven (7) days a week."

*The Facts*

This allegation is categorically untrue. First, the hiring of non-unit casuals and others only occurs when there are openings that no journeymen or juniors, whether from the Post or the other papers, wish to fill. Second, the Post does the hiring of casuals from a casual list it maintains. There are currently five persons on the list. Only one is a white male.

Moreover, the last time casuals were made juniors, there were two juniors who had worked the required threshold. One was a minority.

**Paragraph 22 of the Charge**

*Allegation*

"Respondents have acted in concert to manipulate seniority lists to prevent minorities from becoming Journeymen by placing non-minorities on the list without regard to seniority or shifts worked."

*The Facts*

This allegation is categorically untrue. The Charging Party never raised his misplacement on the list or sought correction based upon any evidence or cogent reason. The Revisions List is based upon employer payroll records. When mistakes have been made, they have been corrected. The process is purely mechanical. The only exceptions are when someone provides a medical reason for being unable to work the 168 shifts required to maintain his or her Revision date.

The Charging party knows, or should know, this allegation, as well as many of the others in the Charge are untrue, because his counsel, Neil Frank, [8] is also representing another union members working at the Post in a litigation against the Union in the United States District Court for the Southern District of New York: Paulino v New York Newspaper Printing Pressmen's Union Local No. 2 et al., 06 Civ 0053.

Although in that litigation, Frank has made some of the same or similar allegations regarding the seniority system, he had the benefit of evidence submitted by the Union outlining how the system works, along with supporting documentation.

**Paragraph 23 of the Charge**

*Charging Party's Allegation*:

"Respondents have intentionally discriminated in favor of non-minorities by allowing part-time employees who are white to become Journeymen and elevated above minorities on the list, in violation of Union By-Laws which allow only full-time employees to become Journeymen. White part-time employees have been given full-time benefits and, unlike minorities and women, are not required to contribute towards the cost of their health insurance."

*The Facts*

These allegations do not have any basis in fact. Nor has the charging party ever raised this complaint internally.

---

[8] The notary on the Charging Party's supporting affidavit is an attorney from Neil Frank's office.

**In the Matter of the Charge by William Malone against New
York Newspaper Printing Pressmen's Union Number Two**

**Case No. 520-2006-03503**

**Exhibits To Union's Letter Position Statement and
Accompanying Factual Response**

Exhibit A

    **Spreadsheet of Post Juniors Shop Seniority List**

Exhibit B

    **Spreadsheet of Post Journeymen Shop Seniority List**

Exhibit C

    **June 15, 2004 Joint Conference Decision**

Exhibit D

    **June 19, 2002 Agreement Re: Joint Labor Management
Training Committee**

Exhibit E

    **May 18, 2006 Agreement between the Union and the Post
concerning manning for dayside "Commercial" work**

Exhibit A

EXHIBIT "A"

SHOP   POST JUNIOR   PRIORITY LIST

| Priority | Last Name | First Name | Minority | Priority | Last Name | First Name | Minority |
|---|---|---|---|---|---|---|---|
| 1 | Lanoce | Ralph | 0 | 34 | Smalls | Robert | 0 |
| 2 | Gangi | Thomas | 0 | 35 | Clarke | Morgan | 0 |
| 3 | Cunningham | William | 0 | 36 | Quick | Jason | 1 |
| 4 | Kelly | Robert | 0 | 37 | Nash | Christophe | 0 |
| 5 | Hernandez | Angel | 1 | 38 | Shacklefor | Reginald | 1 |
| 6 | Abreu | Roberto | 1 | 39 | Nunez | Scotty | 1 |
| 7 | Tortorello | Anthony | 0 | 40 | Villalona | Argenia | 1 |
| 8 | Carew | Holden | 0 | 41 | Buffolino | August | 0 |
| 9 | Quinn | Tom | 0 | 42 | Rintel | Lenny | 0 |
| 10 | Clement | Anthony | 0 | 43 | Fietcher | Michael | 0 |
| 11 | Carter | Jeffrey | 1 | 44 | Boyle | Peter | 0 |
| 12 | Schiller | Mike | 0 | 45 | Duffy | Thomas | 0 |
| 13 | Ng | Sammy | 1 | 46 | Myers | Mark | 0 |
| 14 | Kadian | Barbara | 1 | 47 | Orellana | Mario | 1 |
| 15 | Tomasello | Joe | 0 | 48 | Bogan | Barbara | 1 |
| 16 | Tomasello | William | 0 | 49 | Lynch | Mike | 0 |
| 17 | Dimateo | Tom | 0 | 50 | Steiger | Richard | 0 |
| 18 | McVeigh | James | 0 | 51 | Brockingto | Eric | 1 |
| 19 | Tonnessen | Eric | 0 | 52 | Feinmal | Ricky | 0 |
| 20 | Wilson | Desiree | 1 | 53 | Gonzales | Marco | 1 |
| 21 | Metro | John | 0 | 54 | Clement | Chris | 0 |
| 22 | Coffin | Thomas | 0 | 55 | Gately | Donold | 0 |
| 23 | Fuentes | Steven M. | 1 | 56 | Passaro | Anthony | 0 |
| 24 | Leguillo | Alex | 1 | 57 | Sharif | William | 1 |
| 25 | Wilson | Sheri | 1 | 58 | Cerenzia | Michael | 0 |
| 26 | Wilson | Oliva | 1 | 59 | Amster | Brad | 0 |
| 27 | Donnatin Jr | Frank | 0 | 60 | Jones | Ronnie | 1 |
| 28 | Love | Chris | 0 | 61 | Anzalone | Philip | 0 |
| 29 | Walsh | Brendon | 0 | 62 | Trank | William | 0 |
| 30 | Kochendorfer | Michael | 0 | 63 | Gashi | Afrim | 0 |
| 31 | Kanner | Mark | 0 | 64 | Figueroa | Apolinar | 1 |
| 32 | Smith | Nitricha | 1 | 65 | Pochter | Jeffrey | 0 |
| 33 | Malone | Willie | 1 | | | | |

Women/Minorities

| Number | 23 |
|---|---|
| Percentage | 35.38% |

Exhibit B

SHOP

EXHIBIT "B"
POST
JOURNEYMEN     PRIORITY LIST

| Priority | Last Name | First Name | Minority | Permit | 2006 Transfers |
|---|---|---|---|---|---|
| 1 | Kehoe | Dennis | 0 | 0 | 0 |
| 2 | Kelly | Eugene | 0 | 0 | 0 |
| 3 | Sullivan | Thomas G | 0 | 0 | 0 |
| 4 | Ruggiero | Thomas | 0 | 0 | 0 |
| 5 | Capanelli | Chris | 0 | 0 | 0 |
| 6 | Basso, Jr. | John | 0 | 0 | 0 |
| 7 | McComisk | John | 0 | 0 | 0 |
| 8 | Macaluso | Vincent | 0 | 0 | 0 |
| 9 | Frolich | David | 0 | 0 | 0 |
| 10 | Capenelli, | Richard | 0 | 0 | 0 |
| 11 | Kennedy | John D. | 0 | 0 | 0 |
| 12 | Odekirk | Charles | 0 | 0 | 0 |
| 13 | Luczkiewic | Edward | 0 | 0 | 0 |
| 14 | Santora | Peter | 0 | 0 | 0 |
| 15 | Cantres | George | 1 | 0 | 0 |
| 16 | Lavin | Michael | 0 | 0 | 0 |
| 17 | Waldron | Richard | 0 | 0 | 0 |
| 18 | McMahon | James J. | 0 | 0 | 0 |
| 19 | Muirhead | Charles | 0 | 0 | 0 |
| 20 | Parpis | Michael | 0 | 0 | 0 |
| 21 | Colgan | Brian | 0 | 0 | 0 |
| 22 | Tortora | Michael | 0 | 0 | 0 |
| 23 | Rivera | Frank | 1 | 0 | 0 |
| 24 | Wilkinson | Kevin | 0 | 0 | 0 |
| 25 | Giambrone | Frank | 0 | 0 | 0 |
| 26 | Kennedy | Edward | 0 | 0 | 1 |
| 27 | Benedicks | Kevin | 0 | 0 | 1 |
| 28 | Delaney, J | Daniel | 0 | 0 | 1 |
| 29 | Rigall | John | 0 | 0 | 1 |
| 30 | Santos | Brian | 1 | 0 | 1 |
| 31 | Hearfield | Roy | 0 | 0 | 1 |
| 32 | Martino | Frank | 0 | 0 | 1 |
| 33 | Lyons | James | 0 | 0 | 1 |
| 34 | Atlas | Erik | 0 | 0 | 1 |
| 35 | Fautlisi | Anthony | 0 | 0 | 1 |
| 36 | Meyerson | Michael W | 0 | 0 | 1 |
| 37 | Titus | Tim | 0 | 1 | 0 |
| 38 | Coleman | Carol | 1 | 1 | 0 |
| 39 | Leonessa | Gary | 0 | 1 | 0 |
| 40 | Paulino | Daniel | 1 | 1 | 0 |
| 41 | Clarke | Edward | 0 | 1 | 0 |
| 42 | Spencer | James | 0 | 1 | 0 |
| 43 | Brandon | Sue | 1 | 1 | 0 |
| | | | 6 | 7 | 11 |

| Percent | Women/Minorities | Total | | Percentage |
|---|---|---|---|---|
| Entire | List | 43 | 6 | 13.95% |
| Industry | Journeymen | | | |
| Before | 2006 Transfers | 25 | 2 | 8.00% |
| After | 2006 Transfers | 36 | 3 | 8.33% |
| Permit | Journeymen | 7 | 3 | 42.86% |

Exhibit C

## Joint Conference Decision

WHEREAS various disputes and disagreements, concerning guarantees, hiring order, and hiring practices have arisen between NYP Holdings, Inc. ("Post") and The New York Newspaper Printing Pressmen's Union Local #2 ("Union") under the parties' August 9, 2000 collective bargaining agreement (the "Agreement"); and

WHEREAS the Post and Union convened a Joint Conference Committee ("Committee") pursuant to the Agreement in an effort to fully discuss, conciliate, and settle these disputes; and

WHEREAS the Committee has reached a decision, hereinafter set forth, which shall be final and binding on the Post and Union;

THEREFORE the Post and Union agree as follows:

1.    Subject to the terms of this Joint Conference Decision, for the duration of the term of the Agreement, the Post will guarantee each employee on its Priority List, as of July 1, 2004 (the names of all said employees attached hereto as Exhibit A) (the "Guarantee List"), the opportunity to work five straight time shifts per week (the "Guarantee"). It is agreed that the Post, in its discretion, may add additional names to the Guarantee List, and shall advise the Union of its intent to add those names at least 15 days prior to doing so.

2.    At present, the Post operates its night production using a total of twenty-six (26) presses per week (4 presses 5 nights a week; 3 presses 2 nights a week). In the event that as a result of an economic downturn and/or loss of circulation and/or advertising revenue, the Post determines to reduce the number of presses that

are used on a nightly basis each week, on a permanent basis (i.e for the foreseeable future), then the Union shall be given a minimum of sixty (60) days advance notice of an intention to reduce the Guarantee, and following that sixty (60) day period, the number of pressmen who are Guaranteed, as detailed in paragraph 1, will be·reduced to a number that is consistent with the reduction·in presses. After discussion with the Union to explore alternatives during the sixty (60) day notice period, pressmen will be removed from the Guarantee List in accordance with their priority unless a mutually acceptable alternative is achieved.

Nothing set forth in this Guarantee shall·serve, however, to alter the rights of those employees who are specifically covered by the terms of the August 9, 2000 guarantee, as set forth on pages 48-49 of the Agreement.

3.   In the event that the Post determines to reinstate all or part of the number of presses each week that it had previously eliminated, on a permanent basis (i.e. for the foreseeable future), then the Union shall be given a minimum of thirty (30) days advance notice of an intention to supplement the Guarantee, ·and following that thirty (30) day period, the number of pressmen who are Guaranteed, as detailed in paragraph 1, shall be increased to a number that is consistent with the Company's increase in presses. The pressmen will be reinstated to the Guarantee List in the same method in which they had originally been eliminated.

4.   It is understood that the Guarantee and commitments that are referred to in paragraph 1 of this Agreement will be suspended for the duration of any strike or work stoppage, or in the event of a temporary or permanent suspension of publication and are conditioned on the named pressmen making themsevelves available for work and shall not apply to any employee whose employment is

terminated due to retirement, resignation, discharge or suspension for cause or disability.

5.    The parties agree that the arbitration, AAA 13 3000 00065 04 shall be withdrawn by the Union, with prejudice, and shall be considered settled pursuant to this Agreement (the "Arbitration").    The dismissal of the Arbitration shall not prohibit either the Union or the Post from seeking arbitration concerning any dispute concerning the enforcement or interpretation of this Joint Conference Decision. The parties agree that the following hiring order shall be followed:

(i).    On a two-week basis, the Publisher will post work schedules (the "markup") identifying the scheduled five (5) shifts of work for each Guaranteed and non-guaranteed situation holder, noting vacation or other known absences.

(ii).    On a given shift, based on the unit configuration, this manning will be filled by the Post's Superintendent by first assigning the bottom scheduled Guaranteed juniors to work in the contractually required junior positions in the pressroom.

(iii).    Thereafter, the Superintendent will assign Guaranteed journeymen, non-guaranteed journeymen on the Post's Priority List, and any remaining Guaranteed juniors to fill the contractually required journeymen positions.

(iv).    If additional journeymen are needed, the Post's Superintendent will then hire competent journeymen from other shops who have notified the Chapel Chairman of their availability for work that evening.

(v).    If additional journeymen are still needed to fill the markup, the Superintendent will fill those positions by elevating those Guaranteed Post juniors scheduled to work that evening as juniors to journeymen.

(vi).    The open junior positions, or remaining journeymen positions will be hired from non-guaranteed Post juniors on the markup and then Post juniors, qualified industry juniors, priority casuals and provisional casuals, in that order, who have physically shaped that evening.

3

6.  It is understood and agreed to by the parties that the commitments that are detailed in this Joint Conference Decision shall take precedent over any other understandings, agreements or commitments between the parties concerning the subjects detailed in the paragraphs above.

7.  The Post agrees to establish and to maintain a section 125 wage reduction plan for the duration of the Agreement at its sole cost and expense, so that any employee contribution to the Welfare Fund will be on a pre-tax basis. In addition, the Post agrees to permit its employees, to the extent permitted by law, to remit all past due employee contributions to the Welfare Fund through the 125 Plan provided that the Post is given an appropriate written authorization by the employee to make the salary reduction and remittance.

IN WITNESS WHEREOF, the undersigned have executed this decision on June 15, 2004:

NYP Holdings, Inc.                    New York Printing Pressmen's Union Local No. 2

Agreed: _____        Agreed: _____
By: Joseph Vincent                    By: William Loftus
Title: VP, Labor Relations            Title: President, Local No. 2

4

**Exhibit D**

## AGREEMENT REGARDING JOINT LABOR MANAGEMENT
## TRAINING COMMITTEE

New York Newspaper Printing Pressmen's Union Number Two ("Pressmen's Union") and NYP Holdings, Inc. ("Post") agree to establish a Joint Training Committee ("JTC") to develop, oversee and monitor a four-year training program ("Program") for junior pressmen on the Post's priority list. The JTC will be composed of three persons appointed by the Post and three persons appointed by the Pressmen's Union. The JTC will meet to establish criteria and guidelines for this program.

When a junior pressman has successfully completed the training program established by the JTC, the Post will give him/her the title "New York Post Journeyman." Completion of the Program shall not affect the employee's status within the Union. Junior pressmen who complete the training program shall be eligible to be made permit journeymen by the Union.

It is understood and agreed that the members of the JTC will work together collegially and collaboratively to make the Program a success.

The Post also agrees that when a Post junior or junior working as a permit journeyman receives Union Journeyman status, the Post will honor priority revision time granted the individual by the Union. The Union shall provide the Post with revision lists promptly after all updates. The Union shall hold the Post harmless from any and all liability arising out of Post recognition of Union revision time.

Nothing contained herein shall be construed to amend the parties' collective bargaining agreement.

It is further agreed that the fact of the establishing and operation of the JTC and this Agreement are not intended by either party to be admission against interest on any issue relating to the Post JAC, including the existence of such JAC, and may not be used in arbitration or litigation concerning such issues.

IN WITNESS WHEREOF, the undersigned have executed this Agreement.

For NYP Holdings, Inc.

Agreed: _____
Name

_____
Title    Vice President Operations

_____
Date    6/19/02

For New York Printing Pressmen's
Union No. 2

Agreed: _____
Name    William J. Loftus

_____
Title    President Local #2

_____
Date    1/19/02

Exhibit E



Port Morris Print Center 900 East 132nd Street, Bronx, NY 10454   T 718.742.3180   F 718.292.7721   Mobile 516.313.8415   jvincent@nypost.com

**JOSEPH B. VINCENT**
Vice President Operations

May 11, 2006

John M. Heffernan, President
The New York Newspaper Printing
Pressmen's Union Number Two
275 Seventh Avenue, Suite 1500
New York, NY 10001

Re: Production Manning for Commercial Work

Dear John,

This is to confirm the parties' agreement to modify the production manning requirements in Section 19 of the collective bargaining agreement for the printing of commercial work, as defined below.

1. Commercial work shall be defined as anything printed in the pressroom at the Publisher's Bronx facility which is not part of the Publisher's basic newspaper (i.e. the New York Post) (referred to as the "basic newspaper"). Any section(s) created primarily for use with the basic newspaper such as newly created advance sections for the use with the Sunday or daily editions including, but not limited to, travel, drama, real estate, or the like, shall be considered part of the basic newspaper. The TV Guide will also be considered part of the basic newspaper. Independent suburban or local area newspapers as well as newspapers whose primary area of distribution is outside the New York metropolitan area (e.g. London papers) shall be considered commercial work. Commercial work may also include products which may be inserted into or distributed with the basic newspaper, like a Sunday magazine or separate comic section, advertising inserts or other products of like kind. Commercial work shall not include the printing of the Daily News or New York Times. Notwithstanding anything to the contrary, any product which is composed by the Publisher's employees which is identified as being part of the basic newspaper, whether by logo, insignia or otherwise shall not be considered commercial work.

{W:\876\001\05\06004887.DOC}

⊕ A NEWS CORPORATION COMPANY



Page 2 of 6

Disputes as to what constitutes "commercial work" shall be resolved pursuant to the grievance-arbitration provisions of the collective bargaining agreement on an expedited basis.

2. Products deemed to be commercial hereunder may be inserted into or distributed with the daily or Sunday New York Post to be sold through single copy sale outlets, racks or by other methods.

3. When the Publisher, in its sole discretion, chooses to print such "commercial work" in its Bronx facility pressroom the following production manning shall apply to those presses which during a particular shift are used to perform commercial work:

| Units | Journeymen[1] | Juniors |
|-------|-----------|---------|
| 1 | 3 | 1 |
| 2 | 3 | 1 |
| 3 | 4 | 1 |
| 4 | 4 | 1 |
| 5 | 5 | 1 |
| 6 | 5 | 1 |
| 7 | 6 | 1 |
| 8 | 6 | 1 |
| 9 | 7 | 1 |
| 10 | 7 | 1 |

When 2 or more presses on dayside are in operation a plate boy shall be hired for the room.

When commercial and non-commercial work are printed on the same press during the same shift then the production manning for that press shall be at the highest applicable level for the entirety of the shift.

Effective March 31, 2010, the manning requirements above will be reduced by one journeyman on the 7 roll and 9 roll runs. In addition, to the extent that, after the date of this agreement, the Union enters into any agreement with the New York Times or the Daily News, their successors, contractors, or assigns, covering printing work that contains lower unit manning than provided here, the Publisher, at its option, and upon thirty (30) days notice, may adopt such manning

---

[1] One Journeyman shall be a PIC

John M. Heffernan
May 11, 2006
Page 3 of 6

requirements for such units in place of those set forth in this agreement for
commercial work.

4. With the commencement of commercial printing, the Post will accept a
   minimum of ten journeymen transferees referred by the Union who will be
   added to the New York Post journeymen priority list following the last
   recognized Union journeymen (*i.e.*, Gus Frangoulis) subject to the
   conditions and protocols below:

   a. There must be sufficient work to create the new situations for the
      transferees without causing any current (as of this date) situation
      holders on the New York Post priority list to lose their current
      situations as of the time of the transfer. If, at some future time,
      work does not justify maintaining situations, the Post may layoff
      excess situations and the layoffs will occur in priority order that
      exists at the time of the layoff.

   b. The transfers and the creation of new situations for the transferees
      will be accomplished without creating unnecessary shifts, i.e. there
      will be no hiring above contractual manning or eating of shifts to
      create sufficient shifts.

   c. The Union President will propose journeymen transferees to the
      New York Post, who then must be interviewed and approved by
      the Pressroom Superintendent and the Vice President of Operations
      or his designee. A rejection of a candidate is non-arbitrable.

   d. Current New York Post full (non-permit) journeymen situation
      holders will be given the opportunity in seniority order to transfer
      to days to fill the newly created situations prior to the transferees.
      The journeymen transferees will be assigned in priority order to fill
      the vacancies on nights thus created and the remaining situations
      created on the day side.

   e. Journeymen production manning requirements for all day side
      production, including those created by commercial work and the
      printing of the TV Guide, will be assigned in priority order first to
      Post full journeymen. Junior manning requirements for such day
      side production shall be filled by Post juniors in priority order.

   f. The Post will accept an additional five (5) journeymen transferees
      referred by the Union as additional situations become available
      under the criteria set forth in subsections (a) and (b) above.

   g. Thereafter, the Post will keep the Union advised of the amount of
      work that becomes available as a result of this agreement and will
      meet with the Union to discuss whether additional situations will
      be created. If and when the Publisher determines to create such
      additional situations, the Publisher will fill them using transfers in
      accordance with the protocol set forth above.

{W:\876\001\05\06004887.DOC}

John M. Heffernan
May 11, 2006
Page 4 of 6

5. The first ten transferees will be scheduled to start work during the initial
   mark-up for commercial work performed under the terms of this
   agreement with the five additional transferees scheduled as soon as the
   situations are available.
6. Additional commercial and T.V. Guide work beyond that which can be
   performed by scheduled Post employees will be first assigned to be
   performed by journeymen on the Post priority list as sixth shifts, and then
   will be assigned to outsiders, in accordance with Section 11 unless
   otherwise agreed by the Pressmen's Union and the New York Post.
7. Scheduled overtime shall be distributed equally among journeymen
   assigned to commercial and TV Guide production work. The system for
   equalizing overtime shall be a round robin in which overtime is offered in
   sequence. The Foremen and the Chairman will work together to maintain
   a list posted in the pressroom showing who was offered overtime in order
   to determine who should be offered the next opportunity to work overtime.
   By way of example, assuming journeymen A through H work on a
   particular shift and there are 3 dates on which overtime is available for
   five journeymen on each date:

| Date 1 | Date 2 | Date 3 |
|---|---|---|
| Journeyman A | Journeyman F | Journeyman C |
| Journeyman B | Journeyman G | Journeyman D |
| Journeyman C | Journeyman H | Journeyman E |
| Journeyman D | Journeyman A | Journeyman F |
| Journeyman E | Journeyman B | Journeyman G |

   If someone scheduled to work overtime trips, he or she will be charged as
   if he or she worked. Any failure to offer overtime will be remedied by
   offering the affected journeyman the next available overtime opportunities
   to make up for the lost overtime.
8. Persons assigned pursuant to commercial production manning will not be
   assigned to perform the work covered by the maintenance manning
   requirements except as provided in paragraph 11 (b) below. Persons
   assigned to fulfill the TV Guide manning requirements on the dayside will
   also not be assigned to perform work covered by the maintenance
   manning requirements. This understanding is without precedent or
   prejudice to the Publisher's or Union's position on the subject with respect
   to other work.
9. In order to facilitate the implementation and integration of these separate
   production manning requirements, the transfers of journeymen, and the
   filling of situations, the parties agree to meet regularly as necessary to

{W:\876\001\05\06004887.DOC}



Page 5 of 6

discuss the status of the program and endeavor to anticipate and resolve potential problems or unanticipated consequences.

10. This agreement with respect to the production manning requirements for commercial work is without prejudice and is not a waiver of any rights the parties may have in the event that the Publisher purchases and operates new equipment within the meaning of the "New Equipment" subsection of Section 19.

11. A commercial shift shall be six ½ hours exclusive of lunch. Except for the modifications stated above, all other provisions of the Contract, including the current pay scale, shall apply provided, however,

   a. All commercial production work performed on Sunday dayside shall be paid at a rate which shall be $50 over the scale for a regular shift.

   b. For commercial work covered by this agreement, the production crew shall be paid only for such time actually worked to the extent that post-production tasks are begun prior to end of the regular shift (6 ½ hours). If requested, however, to commence such work after the end of the regular shift (6 ½ hours), then they shall be entitled to work and be paid for one additional hour. The Publisher may require the press crew to perform make ready tasks necessary to prepare their press for the next production run.

12. We have negotiated an agreement designed to increase work for Local 2 and allow the New York Post to begin a commercial printing operation. The parties expect that this expansion of work will ensure the stability of the Bronx facility and the continued employment of all employees currently employed. In the unlikely event that there is an unforeseen contraction in the anticipated work, the parties are committed to exploring alternatives to reducing the force.

13. The provisions of this side letter, although part of the parties' Collective Bargaining Agreement, supersede any conflicting provisions of the Collective Bargaining Agreement or side letters and agreements.

14. To ensure an expeditious implementation of this agreement, the parties agree to the following:

   i. Upon execution, the Publisher will immediately commence interviewing potential transferees

   ii. The necessary union ratification will be held as soon as practicable in accordance with Union By-Laws, but no later than fourteen (14) days following the day after execution of the agreement

{W:\876\001\05\06004887.DOC}



Page 6 of 6

If the above confirms the agreement between NYP Holdings, Inc. and New York Printing Pressmen's Union Local No. 2 concerning the modifications to their existing collective bargaining agreement, please sign in the space provided below.

Sincerely yours,

Joseph Vincent

CONFIRMED AND AGREED SUBJECT TO RATIFICATION:
New York Printing Pressmen's Union Local No. 2

By: _____
John M. Heffernan, President

Negotiating Committee

{W:\876\001\05\06004887.DOC}