UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------x

WILLIE MALONE et al.,

                    Plaintiffs,

     -v-

NEW YORK PRESSMAN'S UNION NO. 2 et al.,

                    Defendants.

-----------------------------------------------------x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 3 1 MAY 2011

No. 07 Civ. 9583 (LTS)(GWG)

## MEMORANDUM OPINION AND ORDER

       Plaintiffs Willy[1] Malone ("Malone"), Desiree Wilson, Sherre Wilson, Olivia

Wilson (the former three defendants collectively, "Wilson Sisters"), Nytrisha Smith ("Smith"),

Angel Hernandez ("Hernandez"), Eva Lee ("Lee"), and Daniel Paulino ("Paulino") (collectively,

"Plaintiffs") brought an action against the New York Printing Pressmen's Union No. 2 (the

"Union") and NYP Holdings, doing business as the New York Post (the "Post") (collectively,

"Defendants") charging Defendants with employment discrimination on the basis of race, color,

and sex in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., and

Section 1981 of the Civil Rights Act of 1866, 42 U.S.C. § 1981. Plaintiffs principally claim that

the Defendant Union took steps designed to deny promotional opportunities to minorities and

women working on the printing presses at the Post, and that the Post acquiesced in such

measures, including an amendment to a Collective Bargaining Agreement ("CBA") that

---

[1]     The motion papers at issue in this Memorandum Opinion and Order spell plaintiff's
name "Willy" whereas the caption and docket in this case spell his name "Willie."
The Court adopts the spelling that plaintiff Malone has used in his own papers.

permitted more senior white male workers to transfer to positions at the <u>Post</u> from other papers. This Court has jurisdiction of the action pursuant to 28 U.S.C. § 1331.

Defendants separately brought motions to dismiss Plaintiffs' Amended Complaint (the "Complaint"), under Federal Rule of Civil Procedure 12(b)(6), for failure to state a claim upon which relief can be granted. Plaintiffs opposed both motions. The Court has reviewed thoroughly and considered carefully all of the parties' submissions. For the following reasons, the motions to dismiss the Complaint are granted.

BACKGROUND

For purposes of this Opinion, all of the non-conclusory factual allegations of Plaintiffs' Complaint are assumed to be true.

The Union's membership is comprised of two classifications of permanent employees: the "Junior Pressmen" and the more senior "Journeymen." (Compl. ¶ 13.) Journeymen are responsible for operating the newspaper presses. They receive priority in staffing and are paid a higher hourly wage than Junior Pressmen. (<u>Id.</u>) When there are insufficient Journeymen and Junior Pressmen to staff a given shift, additional workers, called "Casuals," are hired on a per-shift, as-needed basis in the order in which their names appear on a "Casual list." (<u>Id.</u> ¶ 15.) Once a Casual works 110 shifts within either the first six months of the year or the last six months of the year, he or she qualifies to become a Junior Pressman, is placed on the Junior Pressmen priority list, and is eligible to work a regular schedule. (<u>Id.</u> ¶¶ 16-17.)

The operation of the Union at the <u>Post</u> is governed by the Constitution of the Graphic Communications International Union ("GCIU"), its parent organization (<u>id.</u> ¶ 20), and a CBA executed by the <u>Post</u> and the Union. (<u>Id.</u> ¶ 17.) Under the CBA, Junior Pressmen are

guaranteed to work at least five shifts in any two-week period. (Id.) The GCIU constitution requires that a Junior Pressman complete a four-year apprenticeship before he or she is eligible to advance to Journeyman. (Id. ¶ 20.) The GCIU requires the Union to maintain apprenticeship programs in order to facilitate the advancement of Junior Pressmen to Journeymen in accordance with industry needs. (Id. ¶ 23.) At the Post, in accordance with the CBA, Junior Pressmen with four or more years of experience are labeled "Apprentices." (Id. ¶21.) Once an Apprentice completes his or her four-year apprenticeship, he or she is eligible to advance to the position of Journeyman. (Id. ¶ 22.)

To facilitate the advancement of Junior Pressmen to Journeymen, Defendants established a Joint Apprenticeship Committee and maintained one "priority list" consisting of all Apprentices and Junior Pressmen working within New York City as well as one list consisting of Apprentices and Junior Pressmen within the Post's printing shop. (Id. ¶ 24.) Under the CBA, Defendants agreed to accept joint responsibility for maintaining the program (id. ¶ 25), to administer quarterly examinations for the advancement of Apprentices to Journeyman (id. ¶ 26), and to allow Apprentices to appear before the Joint Apprenticeship Committee at the end of six months for consideration for increased wages. (Id. ¶ 27.)

Malone, the Wilson Sisters, and Smith are African American; Lee is of Chinese heritage; and Hernandez and Paulino are Hispanic. (Compl. ¶¶ 3-10.) At all times relevant, Lee was a Casual at the Post, and all other plaintiffs were Junior Pressmen employed at the Post. (Id.) In 2006, Olivia Wilson, Desiree Wilson, Sherre Wilson, and other eligible women and minorities completed four years as Junior Pressmen and became eligible for promotion to Apprentices. (Id. ¶ 29.) In January 2007, Malone and Smith became eligible to become

Apprentices. (Id. ¶ 31.) The Union, with the complicity of the Post, discontinued the

apprenticeship program in 2006 and, subsequently, did not enroll Malone, Smith, or the Wilson

sisters in the apprenticeship program. (Id. ¶¶ 30, 32, 34-35.) The last advancement from Junior

Pressman to Journeyman occurred in February 2006, when, prior to implementing a freeze on the

advancement of Junior Pressmen, the Executive Board of the Union voted to promote 31 Junior

Pressmen to Journeyman status. (Id. ¶¶ 58-59.)

Plaintiffs allege that the Union has historically discriminated against women and

minorities seeking entry into the newspaper printing industry. (Id. ¶ 48.) From 1995 to 2005, the

Union was bound by a Consent Decree to provide women and minorities in its New York Times

bargaining unit with economic opportunities. (Id. ¶ 49.) Of the Post's 49 Journeymen, less than

5% are members of minority groups: none is African American, and none is female. (Id. ¶¶ 43-

45.) Unionwide, there are currently no female Journeymen. (Id. ¶ 46.) At the Post, some of the

women and minority Junior Pressmen have been classified as "Permit-Journeymen," but they do

not enjoy recognition as Journeymen in the industry. (Id. ¶ 47.)

According to Plaintiffs, the Union discontinued the apprenticeship program as

part of a policy and practice of artificially depressing the number of Junior Pressmen who

advance to Journeyman, with the purpose of restricting Journeyman membership to incumbent

white males and inhibiting the advancement of women and minorities. (Id. ¶¶ 36-37.) Since

2006, the Union, with complicity of the Post, has administered few or no apprenticeship tests as

part of its policy and practice of restricting Journeyman membership to incumbent white men,

and inhibiting the advancement potential of women and minorities. (Id. ¶¶ 38-39.) The Union's

decision as to whether to advance additional Junior Pressmen to Journeymen "depend[s]

exclusively on the whim of an all white Executive Board." (Id. ¶ 53.)  Plaintiffs assert that these restrictions on advancement serve no legitimate business purpose, and are intended to perpetuate the current effects of past discrimination against women and minorities (id. ¶ 41), to restrict Journeyman membership to white male incumbents (id.), and to indefinitely relegate women and minorities to the bottom of the hierarchy at the Post.  (Id. ¶ 42; see id. ¶¶ 55-56.)  The Post, in failing to ensure the continuation of an apprenticeship program, has acquiesced in the Union's discriminatory conduct.  (Id. ¶ 52.)

In May 2006, Defendants modified the CBA to allow 15 Journeymen to transfer from the Daily News to the Post, and to allow additional staffing needs to be accommodated by further transfers.  (Id. ¶¶ 60, 62.)  Of the 15 transferred Journeymen, 14 are white men; one is a Hispanic man.  (Id.)  These transfers were hired to work on the production of outside publications, not the Post itself; however, the transfers have worked on the Post as well as on the outside publications.  (Id. ¶¶ 61, 63.)  The transfers were placed onto the Journeyman priority list at the Post, and enjoy priority above all of the Plaintiffs.  (Id. ¶¶ 64-65.)  Plaintiffs allege that there was no legitimate business purpose for the transfer "insofar as there were qualified Pressmen at the Post" who could meet all of the staffing needs, and "insofar as there was sufficient work available to [the transfers] at the Daily News."  (Id. ¶¶ 66-67.)  The Union's purpose in transferring these Journeymen was to "further the interest of its white incumbent Journeymen members at the expense of its own bargaining unit."  (Id. ¶ 68.)  Its intent was to "dilute" the priority of women and minorities and perpetuate the effects of past discriminatory behavior.  (Id. ¶ 69.)

Plaintiffs assert that the arrival of the transfers has had a disparate impact on the

earning power of women and minorities at the Post. (Id. ¶ 70.)  The transferees have availed themselves of work opportunities that would have otherwise been available to women and minorities. (Id.)  The transferees' presence has reduced the opportunity for women and minorities to work in temporary Journeyman positions and made it more difficult for Junior Pressmen to work the minimum number of shifts needed to maintain their position within the Union. (Id. ¶¶ 73-75.)  In addition, the presence of the transfers has decreased the number of shifts available to Lee and other women and minorities who work as Casuals at the Post; that is, it has made it impossible for Lee to work the 110 shifts necessary to attain Union membership. (Id. ¶¶ 79-80.)

The Union's transfer of the 15 Journeymen adversely affected the shop priority of approximately 92% of the women and minority pressmen but only 49% of the white male pressroom employees at the Post. (Id. ¶ 71).  The presence of the transferees also threatens the job security of minorities employed as Junior Pressmen at the Post: since the arrival of the transferees, 29% of the minority and female pressmen have been laid off due to lack of work, and the next scheduled reduction may result in a total loss of 45% of the minority and female pressmen. (Id. ¶¶ 76-78.)

In August 2006, Malone filed a charge of employment discrimination with the Equal Employment Opportunity Commission ("EEOC"). (Id. ¶ 82.)  On July 30, 2007, he received a Notice of Right to Sue. (Id. ¶ 83.)  The instant action was commenced on October 25, 2007.  Plaintiffs' Complaint enumerates six Claims for Relief: (1) that the Union's negotiation of the provision for transfer of outside Journeymen to the Post constituted intentional discrimination on the basis of race by the Union in violation of Title VII, and that the effectuation of such

transfers has had a disparate impact on "the minority Pressmen in violation of Title VII"; (2) that

the Union's discontinuation of the apprenticeship program and Journeyman tests, freezing of

Journeyman advancement and agreement to transfer outside Journeymen into the <u>Post's</u>

bargaining unit constituted intentional discrimination on the basis of race by the Union in

violation of Section 1981; (3) that the Union's negotiating the provision for transfer of outside

Journeymen to the <u>Post</u> constituted intentional discrimination on the basis of sex by the Union in

violation of Title VII and that its agreement to transfer such Journeymen to the <u>Post</u> has had a

disparate impact on female Pressmen's economic opportunities in violation of Title VII; (4) that

the <u>Post's</u> agreement to transfer outside Journeymen to its pressroom constituted intentional

discrimination on the basis of race in violation of Section 1981; (5) that the transfer of

Journeymen to the <u>Post</u> constituted intentional discrimination on the basis of sex by the <u>Post</u> in

violation of Title VII; and (6) that the transfer of Journeymen to the <u>Post</u> constituted disparate-

impact discrimination on the basis of race by the <u>Post</u> in violation of Title VII.

   Plaintiffs request monetary damages and injunctive relief.  Defendants move for

dismissal pursuant to Rule 12(b)(6).

## DISCUSSION

   In deciding a motion to dismiss under Rule 12(b)(6), the Court accepts as true the

non-conclusory factual allegations in the complaint and draws all reasonable inferences in the

plaintiff's favor.  <u>Roth v. Jennings</u>, 489 F.3d 499, 501 (2d Cir. 2007); <u>see also</u> <u>Ashcroft v. Iqbal</u>,

129 S. Ct. 1937, 1949 (2009).  However, "the tenet that a court must accept a complaint's

allegations as true is inapplicable to threadbare recitals of a cause of action's elements, supported

by mere conclusory statements." <u>See</u> <u>Iqbal</u>, 129 S. Ct. at 1940.  With respect to the pleading

standards of Rule 8, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Iqbal, 129 S. Ct. at 1949. This plausibility standard does not amount to a "probability requirement," but it calls for more than a "sheer possibility that a defendant has acted unlawfully." Id. (internal quotation marks and citation omitted). "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." Id. (internal quotation marks and citation omitted).

In deciding a motion to dismiss, the Court may consider, in addition to the factual allegations of the complaint, "documents attached to the complaint as an exhibit or incorporated in it by reference, . . . matters of which judicial notice may be taken, or . . . documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit." Brass v. American Film Tech., Inc., 987 F.2d 142, 150 (2d Cir. 1993) (citing Cortec Indus., Inc. v. Sum Holding L.P., 949 F.2d 42, 47-48 (2d Cir. 1991)). The Court has, accordingly, considered the predicate EEOC complaint as well as pleadings and orders in the prior lawsuits that Defendants claim have res judicata effect.

Administrative Remedies

When bringing a Title VII complaint, a plaintiff must file a timely complaint with the EEOC and receive a right-to-sue notice. 42 U.S.C. § 2000e-5(e) (West 2010). A federal court generally does not have jurisdiction to adjudicate claims that are not asserted within the EEOC charge. Brown v. Coach Stores, Inc., 163 F.3d 706, 712 (2d Cir. 1998). "This exhaustion requirement is an essential element of Title VII's statutory scheme, and is designed to give the administrative agency the opportunity to investigate, mediate, and take remedial action." Shah v.

New York State Dep't of Civil Serv., 168 F.3d 610, 614 (2d Cir. 1999) (internal quotations and citations omitted).  However, an exception to this rule exists: actions that are "reasonably related" to the filed charges may be maintained.  Butts v. City of New York Dep't of Hous. Pres. & Dev., 990 F.2d 1397, 1401-02 (2d Cir. 1993).

       Plaintiffs' EEOC filing is asserted as a class charge and makes a range of allegations relating to the apprenticeship program, Journeyman promotions, and transfer systems.  In their Complaint Plaintiffs allege, inter alia, that the Union discontinued the apprenticeship program; failed to enroll Plaintiffs Malone, the Wilson Sisters, and Smith in the apprenticeship program; implemented a "freeze" on the promotion of Junior Pressmen to Journeymen; that Defendants' actions in connection with the transfers artificially depressed the number of Journeymen in order to discriminate against minorities; and that Defendants, as a result of the transfer, laid off 29% of the female and minority pressmen employed at the Post. The current claims are within the reasonably related range of matters that the charge gave the EEOC the opportunity to investigate.  Cf. Brown, 163 F.3d at 712 (finding plaintiff's disparate impact claim "reasonably related to her failure to promote claim as we would expect that the EEOC, in investigating the complaint, would have assessed [defendant's] promotion policies and their effect on minority employees.")  Plaintiffs have, therefore, exhausted their administrative remedies.

Merits of Title VII and Section 1981 Claims

       Defendants contend that Plaintiffs have failed to state viable disparate treatment and disparate impact claims under Title VII and Section 1981.  The standards under Section 1981 mirror those of Title VII.  See Staff v. Pall Corp., 233 F. Supp. 2d 516, 527 (S.D.N.Y.

2002) ("Both the Supreme Court and Second Circuit have treated the substantive issues arising under Title VII and § 1981 identically.") (citing Patterson v. McLean Credit Union, 491 U.S. 164, 186 (1989) and Hawkins v. 1115 Legal Service Care, 163 F.3d 684, 693 (2d Cir. 1998)).

 Title VII of the Civil Rights Act of 1964 prohibits disparate treatment on the basis of race, color, religion, sex, or national origin, as well as facially neutral conduct that has a disparate impact on the basis of race, color, religion, sex, or national origin. Ricci v. DeStefano, 129 S. Ct. 2658, 2672 (2009). At the pleadings stage, a plaintiff need not allege specific facts establishing each element of a prima facie case of disparate treatment. Swierkiewicz v. Sorema N.A., 534 U.S. 506, 511-12 (2002). Rather, a plaintiff's pleadings are judged by a notice-pleading standard; a plaintiff alleging employment discrimination must allege sufficient facts to give a defendant reasonable notice of the claims against it. Boykin v. KeyCorp, 521 F.3d 202, 212-13 (2d Cir. 2008). "Iqbal was not meant to displace Swierkiewicz's teachings about pleading standards for employment discrimination claims because in [Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007)], which heavily informed Iqbal, the Supreme Court explicitly affirmed the vitality of Swierkiewicz." Gillman v. Inner City Broadcasting Corp., No. 08 Civ. 8909 (LAP), 2009 WL 3003244 at *3 (S.D.N.Y. Sept. 18, 2009).

 In elaborating what allegations are sufficient to state a plausible claim, and therefore survive a motion to dismiss, the Supreme Court has explained: "[d]etermining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. . . . But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not 'show[n]' – 'that the pleader is entitled to relief.' Fed.

R. Civ. P. 8(a)(2)." Iqbal, 129 S. Ct. at 1950 (internal citation omitted).

"Swierkiewicz does not, however, relieve a plaintiff of the obligation to identify in his pleadings a specific employment practice that is the cause of the disparate impact." Kulkarni v. City Univ. of New York, No. 01 Civ. 10628 (DLC), 2002 WL 1315596, at *2 (S.D.N.Y. Jun. 14, 2002) (dismissing Title VII disparate impact claim for failure to sufficiently identify a specific discriminatory employment practice). "A plaintiff must allege, as the Supreme Court has held, those facts necessary to a finding of liability . . . [and] a plaintiff's allegations, accepted as true, must be sufficient to establish liability." Amron v. Morgan Stanley Inv. Advisors, Inc., 464 F.3d 338, 343-44 (2d Cir. 2006). In order to survive a motion to dismiss, allegations of employment discrimination under Title VII must make out a plausible claim that a plaintiff experienced discrimination effected either through disparate treatment of members of a protected group or through a facially neutral classification that resulted in a disparate impact on a protected group.

*Disparate Treatment*

In accordance with McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973), to establish a prima facie case of discrimination a plaintiff must show that (1) she is a member of a protected class; (2) she was qualified for the position held; (3) she suffered an adverse employment action; and (4) the circumstances surrounding the action gave rise to an inference of discrimination. St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 506 (1993). As noted above, although a plaintiff need not allege specific facts establishing all elements of a prima facie case of disparate treatment to survive a motion to dismiss, a plaintiff must allege sufficient facts to give a defendant reasonable notice of the claims against it.

Plaintiffs have alleged adequately their membership in protected group(s), but proffer insufficient facts with respect to the second and third prima facie elements to meet the notice-pleading standard described in <u>Swierkiewicz</u> and <u>Iqbal</u>. Specifically, Plaintiffs have not identified any adverse employment action. Absent from Plaintiffs' allegations is any specific decision (<u>e</u>.g., firing, demotion, failure to hire or promote, etc.) that is alleged to have been made explicitly on basis of race, color, or sex, nor have they connected the transfer of Journeymen to such action. Rather, Plaintiffs allege that hiring decisions were made pursuant to a CBA modification to an established seniority system, and that the operation of promotions was done in a manner consistent with the seniority system and CBA modification, which had the result of depressing the potential for advancement of junior members of the system.

The elimination of speculative, potential future opportunities is insufficient to establish an adverse employment action. Indeed, Plaintiffs do not claim they were eligible under the seniority system for any position that actually ever opened. Plaintiffs' conclusory allegations that the relevant seniority system was specifically maintained by the Union to perpetuate discrimination are insufficient to move their allegations from the merely possible to the plausible, especially in light of the bona fide seniority system exception to Title VII. <u>See</u> 42 U.S.C.A. § 2000e-2(h) (West 2010) ("Notwithstanding any other provision of this subchapter, it shall not be an unlawful employment practice for an employer to apply different standards of compensation, or different terms, conditions, or privileges of employment pursuant to a bona fide seniority or merit system"); <u>Int'l. Bhd. of Teamsters v. United States</u>, 431 U.S. 324, 348-55 (1977).

The Court must, under the <u>Swierkiewicz</u> standard, permit Plaintiffs to rest on

allegations of discrimination at the pleadings stage if the allegations provide adequate notice to Defendants of what, precisely, Plaintiffs allege constituted an adverse employment action and the form the discrimination took. <u>Boykin</u>, 521 F.3d at 214-15. Here, however, Plaintiffs have failed to provide such notice, instead summarily labeling actions such as the Journeymen transfer discriminatory and failing to connect this transfer to any concrete adverse employment action. Plaintiffs have, therefore, failed to state a disparate treatment claim upon which relief could be granted under Title VII.

*Disparate Impact*

Plaintiffs also allege that the Defendants' transfer of Journeymen into the <u>Post</u>, although facially neutral, had an impermissibly disparate impact on the basis of sex, race, and color. The allegations of disparate impact are also fatally deficient. Plaintiffs allege that "the purpose in negotiating the transfer of Journeymen from another bargaining unit to the Post was to further the interest of its white incumbent Journeymen members at the expense of members of its own bargaining unit." (Compl. ¶ 69.) Plaintiffs allege that there are no female or African American Journeymen, and that only one of the fifteen transferee Journeymen was non-white. (<u>Id.</u> ¶¶ 44-45, 60.) The disparate impact of the Journeymen transfer is alleged to fall on the Junior Pressmen, a group that, while comprised predominantly of white men, contains virtually all of the women and minorities in the relevant pressroom workforce.

"The basis for a successful disparate impact claim involves a comparison between two groups–those affected and those unaffected by the facially neutral policy. This comparison must reveal that although neutral, the policy in question imposes a 'significantly adverse or disproportionate impact' on a protected group of individuals." <u>Tsombanidis v. West Haven Fire</u>

Dept., 352 F.3d 565, 575 (2d Cir. 2003). "Whether utilizing statistics or some other analytical method, plaintiffs must also utilize the appropriate comparison groups. They must first identify members of a protected group that are affected by the neutral policy and then identify similarly situated persons who are unaffected by the policy." Id. at 576-77.

Here, Plaintiffs seek to frame their disparate impact claim by comparing the proportion of all white pressroom employees whose advancement and employment opportunities were affected by the Journeyman transfers and restriction of the apprenticeship program with the proportion of all minority and female pressroom employees and Casuals whose opportunities were so affected. In the context of their allegations regarding the composition of the Journeyman workforce (nearly all-white), the concentration of minorities and women in the Junior and Casual ranks, and the seniority status of the white Journeymen, it is apparent that Plaintiffs have not compared similarly-situated groups. Furthermore, nothing in the Complaint suggests that the impact of the transfer and apprenticeship policies does not fall equally on all Junior Pressman and Casuals. No facts are plead that demonstrate that the complained-of, facially neutral policies affect minority and female Juniors and Casuals more harshly than they affect white Juniors and Casuals. In the absence of such facts, the Complaint fails to state a viable disparate impact claim.

In light of the Court's conclusions regarding Plaintiffs' failure to state viable disparate treatment and disparate impact claims, it is unnecessary for the Court to address the parties' remaining arguments.

### CONCLUSION

For the foregoing reasons, Defendants' motions to dismiss Plaintiffs' Complaint

are granted in their entirety.

This Memorandum Opinion and Order resolves docket entries nos. 117, 120, and 121.

The Clerk of Court is respectfully requested to enter judgment dismissing the Amended Complaint and close this case.


SO ORDERED.


Date:   New York, New York
        May 31, 2011

                                            _____
                                            LAURA TAYLOR SWAIN
                                            United States District Judge